JS



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | 16-CR-354 |
| Plaintiff | : | |
| vs. | : | Philadelphia, Pennsylvania |
| | : | December 18, 2017 |
| MATTHEW HANDY | : | |
| | : | |
| Defendant | : | SENTENCING HEARING |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

FILED

APR - 2 2018

- - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:     ANITA D. EVE, ESQUIRE
                        U.S. ATTORNEY'S OFFICE
                        One Independence Mall
                        615 Chestnut Street, Suite 1250
                        Philadelphia, Pennsylvania  19106

For the Defendant:      KATHLEEN M. GAUGHAN, ESQUIRE
                        FEDERAL DEFENDERS OFFICE
                        The Curtis Center, Suite 540
                        601 Walnut Street
                        Philadelphia, Pennsylvania  19106

- - -

Also Present:           Joseph Petrarca
                        Probation Officer

ESR Operator:           Patrick Kelly

TRANSCRIBED BY:         Drummond Transcription Service
                        Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

LASER BOND FORM A   ⊛   PENGAD • 1-800-631-6989 • www.pengad.com

1          (At 9:24 a.m. in Courtroom 11A.)

2          THE COURT:  You may be seated.

3          This is the matter of the <u>United States of America</u>

4 <u>versus Matthew Handy</u> at Criminal No. 16-354.  The defendant was

5 charged by cyberstalking in violation of Title 18, Section 26 --

6 2261(A)(2)(B), one count.

7          Counts 2 and 3 were the charges involving the

8 interstate use of a telecommunications device to willfully

9 convey a threat in violation of Title 18, Section 844(e).

10          And Counts 4 and 5, false statements in violation of

11 Title 18, Section 1001(a).

12          He pled guilty on April 24th, 2017, the case now -- is

13 now before us for sentencing.

14          The Court recognizes the Assistant United States

15 Attorney Anita Eve and next to Anita Eve, is the case agent,

16 Joseph A. Milligan, Jr. --

17          MS. EVE:  Good morning, your Honor.

18          THE COURT:  -- the case agent.

19          Good morning.

20          CASE AGENT:  Good morning.

21          THE COURT:  The Government -- the Court also

22 recognizes defense counsel, Kathleen Gaughan.

23          MS. GAUGHAN:  Good morning, your Honor.

24          THE COURT:  Good morning.

25          And seated next to Attorney Gaughan is the defendant,

1   Matthew Handy.

2           THE DEFENDANT:  Good morning, your Honor.

3           THE COURT:  Good morning.

4           So, the Court has reviewed the presentence

5   investigation report, noted that the Government filed a number

6   of objections to the presentence investigation report.

7           The defendant filed one objection to the presentence

8   investigation report.

9           However, there were no motions filed on behalf of the

10  Government or the defense -- well, there was one motion filed

11  for an upward departure under the Sentencing Guideline 3A1.4.

12  The defendant did not file any motions.

13          So, I believe, I have a few objections to resolve

14  before I proceed to sentencing, is that correct?

15          MS. EVE:  Yes, your Honor.

16          THE COURT:  So, I noted that the Government asked for

17  an extension and following the extension, just last week, the

18  Government filed a pre-sentencing -- the presentence memorandum.

19  I'm not so sure whether the presentence memorandum raised any

20  new issues, but I wanted to find out from the Probation officer

21  and the defense whether you had enough time to address any new

22  issues that were raised in the Government's memorandum?

23          PROBATION OFFICER:  Good morning, your Honor and my

24  apologies for the delay, I put the date and the time on the

25  calendar incorrectly.

1          THE COURT:  Right.

2          PROBATION OFFICER:  I have not received a copy of the

3    Government's sentencing memorandum, so I haven't had a chance to

4    review it.

5          THE COURT:  Okay.

6          MS. GAUGHAN:  And, your Honor, I sent a copy of my

7    sentencing memorandum along with my documents evaluation to

8    Probation, so that they'll --

9          THE COURT:  Right.

10         PROBATION OFFICER:  I have -- I have to review that.

11         THE COURT:  So, you are aware that, the Government has

12   taken issue with your guidelines calculation to the extent that

13   you did not address Counts 2 and 3 -- well, I think, they agreed

14   with you, Counts 2 and 3 group with Count 1, but 4 and 5?

15         You -- I think, you addressed that in your presentence

16   investigation report.

17         PROBATION OFFICER:  I did -- I did, your Honor and I

18   also addressed it in the addendum.

19         It's not that I did not address it, I think, it's just

20   the issue that the Government does not agree with how it was

21   addressed by the guidelines manual of record.

22         THE COURT:  No, I -- I understand.

23         So, ultimately, it's my decision to decide whether or

24   not, you were correct in the guidelines calculations --

25         PROBATION OFFICER: Yes.

1          THE COURT:  -- and application of the --

2          PROBATION OFFICER:  Yes.

3          THE COURT:  -- twelve-level enhancements, et cetera,

4     but I think, the Government also raised the issue of seeking an

5     upward departure even -- even if -- if you correctly calculated

6     the guidelines in any event -- under the guidelines.

7          PROBATION OFFICER:  And I -- I believe, I put that I

8     did not identify any grounds for a departure --

9          THE COURT:  Right.

10          PROBATION OFFICER:  -- so, our position is still that.

11          THE COURT:  All right.

12          So, you've had enough time -- I mean, this is not

13     cutting anyone -- catching anybody by surprise?

14          PROBATION OFFICER:  Unless there are issues other than

15     those to discuss in the sentencing memorandum, I've had enough

16     time.

17          THE COURT:  All right.

18          How about -- about the defense?

19          MS. GAUGHAN:  Your Honor, I'm prepared to address all

20     of the issues.

21          THE COURT:  Right.

22          And you didn't raise it at -- these issues that you've

23     raised, have been raised with the Probation Department before,

24     right?

25          MS. EVE:  Yes, your Honor.

1          THE COURT:  Okay.

2          So, the way I understand it -- the way I understand

3    this -- and I am going to just make a brief statement on the

4    record, sort of to outline what the dispute between the

5    Government with regards to the objection is and also, the

6    dispute with the defense.

7          But then, I am going to reverse it and address the

8    argument, first, the defense argument, because I think that's

9    the easiest one to focus on and then, address the Government's

10   -- the Government's objections on the record with regards to

11   what they claim.

12         So, if I understand it correctly, the Government's

13   filing raises several objections to the guidelines calculations.

14   In the presentencing memorandum, the Government asserts that the

15   Probation officer did not explain its guidelines calculations

16   for Counts 2 and 3.  Counts 2 and 3 charge with inter --

17   interstate use of a telecommunications device to willfully

18   convey a threat in violation of Title 18, Section 2261(A)(2)(B),

19   the applicable guidelines is 2A6.1.

20         And under that guideline, the Government asserts that

21   the base offense level for that offense is twelve, 2A6.1A1 and

22   it should be increased four levels to sixteen because the

23   threats caused substantial disruption of a school.

24         As the Court 1 and 3, all group in the presentence

25   investigation report, my understanding is that the Probation

1   officer grouped Counts 1 and 3, so the count with the highest

2   offense level would control the guidelines and that would have

3   been Count 1.  And because the offense level for Courts 2 and 3

4   is lower than Count 1, Count 1 and 3 do not impact the ultimate

5   guidelines calculations.

6          The Government next argued that, the Probation

7   officers did not identify the applicable guidelines for Counts 4

8   and 5, which are false statements in violation of Title 18,

9   Section 1001(a), the applicable guideline for Counts 4 and 5 is

10  2J1.1B1C.

11         And under the guidelines, the Government asserts that

12  the base offense is fourteen, which may be increased by twelve

13  levels, because the false statements to Homeland Security

14  charged in Count 4, arguably, is a case -- or a count of

15  domestic terrorism and addressing the addendum to the

16  presentence investigation report at Paragraph 20.

17         Of course, this calculation if I sustain the

18  objection, would change the offense level excluding the

19  vulnerable-victim enhancement and the acceptance of

20  responsibility to twenty-six.

21         And the Government objects to the presentence

22  investigation report on the basis that the Probation officer

23  failed to consider the application of 3A1.4, a federal crime of

24  terrorism.

25         So also, the Government objects to -- or is requesting

1   clarification -- regarding the obstruction of justice two-level

2   enhancement.  I know that the defense counsel did not object to

3   that.

4           Are you still seeking clarification to the two-level

5   enhancement or it's that the Probation officer adequately laid

6   it out, why there is a two-level enhancement, rather than a

7   calculation of twelve levels to the base offense level on the

8   basis that it involves a crime of domestic terrorism?

9           MS. EVE:  Your Honor, I'd -- I sought clarification, I

10  did not receive a response from the Probation office in terms of

11  my inquiry.

12          THE COURT:  Isn't it pretty clear, laid out in the

13  presentence investigation report, why the Probation officer

14  applied a two-level enhancement for Counts 4 and 5, rather than

15  a twelve-level for the domestic -- domestic crime of terrorism?

16          MS. EVE:  Well, your Honor, there's no reference in

17  Paragraph 32, that it relates to Counts 4 and 5.

18          THE COURT:  Okay.

19          MS. EVE:  And --

20          THE COURT:  It could relate to -- it could relate to

21  either one of them, but okay, so I understand that, you still

22  need clarification or -- or you -- so, you think it doesn't

23  apply?

24          MS. EVE:  Well, your Honor, I think that Application

25  Note 4 which pertains to an act of domestic terrorism --

1          THE COURT:  It doesn't fit the defin -- well, I'm

2     going to address it a few minutes, I just wanted to outline what

3     the dispute is.

4          So, I think that those are your objections, right?

5          MS. EVE:  Yes, your Honor.

6          THE COURT:  Okay.

7     Let me move on then with regards to the defense.

8          The defense objects to Paragraph 30, 37 and 63 of the

9     presentence investigation report, specifically, the defense then

10    objects to the application of a two-level vulnerable-victim

11    enhancement.

12         My understanding is, that the defense asserts that

13    there is no nexus between the victim's vulnerability and the

14    ultimate crime's success as laid out in Paragraph 21 and they

15    cite to the three-level -- or three-element test -- to determine

16    whether or not, the vulnerable-victim enhancement should apply:

17         One -- and that is -- that is, I believe, the test

18    that I have to apply in this circuit as supported by the case

19    law.

20         One, being that the victim was particularly

21    susceptible or vulnerable to the criminal conduct, that the

22    defendant knew or should have known of his susceptibility or

23    vulnerability and the vulnerability or susceptibility

24    facilitated the crime in some manner, that is, whether there was

25    a nexus between the victim's vulnerability and the crime's

1    ultimate success.

2         So, the defendant did not provide case law, but there

3    is plenty of case law adopting that test in the Third Circuit,

4    in this case, the United States versus Adello (ph), 836 Federal

5    3rd, 330 at 232nd, a 2016 case from the Third Circuit.  United

6    States versus Slats (ph), also a Third Circuit case, 2002.  And

7    United States versus Ia -- I'm sorry -- Eonon (ph), a Third

8    Circuit decision, 1999, all applying this test.

9         Do I understand it, basically, your argument

10   correctly, you -- you concede that the Government is able to

11   meet or the Probation officer is able to meet Element 1 and 2,

12   but you'd take issue with Element 3?

13        MS. GAUGHAN:  That is correct, your Honor.

14        THE COURT: And your argument is, essentially, that all

15   three elements must be present?

16        MS. GAUGHAN:  Yes, that is the standard --

17        THE COURT:   All right.

18        MS. GAUGHAN:  -- all three must be present.

19        THE COURT:  So, let me then address that argument,

20   first and then, I will -- I guess -- I will rule on that

21   argument and then, I will address the Government's issues next.

22        So, why don't you make your point and, perhaps,

23   we could have a discussion and -- and answer some of my

24   questions --

25        MS. GAUGHAN:  Sure.

1          THE COURT:  -- because what troubles me in this case

2    with regards to that enhancement, of course, is the element of

3    facilitation, whether he facilitated -- which is what you'd take

4    issue with -- but for example in this case, Mr. Handy knew full

5    well, her vulnerability, I mean, there's not doubt about it --

6          MS. GAUGHAN:  Yes, your Honor.

7          THE COURT:  -- he admitted it.

8          MS. GAUGHAN:  Correct.

9          THE COURT:  He even states in -- in his e-mails, it's

10   -- it's front right and center, that based on their

11   relationship, based on his admission, he knows that she's

12   vulnerable and she could be manipulated and she -- and he

13   intended to manipulate her, so that he could, eventually, return

14   to her in addition to punishing her and all of that.

15          So --

16          MS. GAUGHAN:  Hm-hmm.

17          THE COURT:  -- so, so he knew that by putting pressure

18   on her that she would turn back to him, doesn't that meet the

19   element of facilitation?

20          MS. GAUGHAN:  It does not, your Honor.

21          And I think that the Court has to really look to the

22   standard that's been developed in the -- in the Third -- in this

23   circuit, in the third Circuit, that's --

24          THE COURT:  But it's just the connection between one

25   and the other, it doesn't have to --

1          MS. GAUGHAN:  Well --

2          THE COURT:  -- it doesn't have to establish that it

3    caused --

4          MS. GAUGHAN: It doesn't --

5          THE COURT:  -- the Government -- or it caused the

6    crime or it caused the Government to do anything as a result of

7    it.

8          MS. GAUGHAN:  No, but it does -- it does require that

9    to facilitate the success of the crime.  And your Honor, I am

10   asking you to look at what the -- what the Probation Department

11   has looked to to determine if a vulnerable-victim enhancement

12   applies in this case.  And specifically, in their addendum, they

13   identified the anonymous threats that were sent to the various

14   agencies.

15         THE COURT:  Right.

16         MS. GAUGHAN:  So, what the Court needs to look to,

17   Judge in the -- and in that case is, did the fact that she had

18   mental-health issues, ah, did that contribute to the success of

19   -- of the agency's inter -- you know -- looking in to these

20   threats or not.  By -- by the Government's own evidence,

21   obviously, all of these threats, regardless of if someone has a

22   mental illness or not, it would be thoroughly investigated by

23   the agencies involved.

24         So, that's her status of whether she had a mental-

25   illness or she didn't, it had no bearing whatsoever on the

1  investigative part of these various agencies in looking in to

2  these threats.  If I could just con --

3          THE COURT:  Doesn't it explain -- you've focused --

4  you're asking me to focus on what the -- the agencies -- what

5  the local police, what the New Jersey federal authorities, what

6  the Philadelphia federal authorities, what the Crimes Stoppers,

7  what the National Center for Minor Children Exploitation, what

8  they had to do in response to a -- a fake report, because they'd

9  have to track it down, especially, in the sensitive areas of

10  child exploitation and molestation, terrorism and -- and drugs

11  and gun violence.

12          So, he knew full well, that he was going to cause or

13  he intended them to cause to investigate her?

14          MS. GAUGHAN:  Understood, Judge.

15          But I don't think under the standards set forth in the

16  Third Circuit that that's adequate to apply a vulnerable victim,

17  if you'd look at the cases, it --

18          THE COURT:  So, what does -- what does --

19          MS. GAUGHAN:  -- I'll --

20          THE COURT:  -- nexus mean?

21          MS. GAUGHAN:  A nexus means that it contributed to the

22  success of the crime.  For example, Inanella, there was a

23  victim, who they determined to be vulnerable, he was a Vietnam

24  vet, he suffered from post-traumatic stress disorder.

25          There was an individual, who had got him to invest in

1    a fraudulent scheme, went to the bank and perpetrated the fraud,

2    had him sign checks, things of that nature.  That -- that

3    vulnerability right there, the fact that he was able to be

4    influenced by this person, contributed to the success of him

5    being able to complete the fraud.  So, there has to be a nexus

6    in the completion of the crime charged.

7            So, in this case, when you are talking about the

8    threats and the identification of that vulnerable-victim

9    enhancement going to that, you have to look at, did the facts

10   that he said to these various agencies in anonymous tips, both

11   to the state and local agencies, did that information that this

12   person had a mental illness or in one instance, that she faked

13   the mental illness, did that contribute to the success of the --

14   of the crime?

15           And I'd submit to you, Judge, it did not.  It did not,

16   because their own agency, basically said during the interview,

17   the audio interview with the complainant in this case, it

18   doesn't matter what the allegations are, you understand whatever

19   allegations are made must be investigated.

20           So, the fact that she may have been a vulnerable

21   victim under the actual statement -- which I am conceding -- she

22   -- she could be in terms of, she has a mental illness that would

23   satisfy that, there still has to be a satisfaction of the third

24   element.  And in this case, there was no demonstrated nexus

25   between these investigative agencies interviewing the threats

1    that he made because of her vulnerability, there is simply no

2    nexus in that.

3              THE COURT:  Very well.  Okay.

4              What is the Government's response?  What is the nexus

5    to the success of -- her vulnerability and the nexus to the

6    success of the crime?

7              MS. EVE:  Well, your Honor, one of the things is, is

8    that the defendant had stated that the Salvation Army facility

9    is in Chester.

10             So, this was an individual that was known to them and

11   so, when there was a threat being made by the defendant that a

12   bomb -- that the defendant -- that the victim in this case

13   planned to blow up the Chester Salvation Army, there was a

14   relationship between her and that facility.

15             There was also a relationship between this defendant

16   and the Buena Vista Middle School, the defendant had attended

17   that school and at that particular time, her younger brother was

18   a student at that school.

19             THE COURT:  Yeah, but the question is, is the -- yeah,

20   there is a relationship, but the -- the issue here is, the --

21   her vulnerability due to mental illness that he was aware of --

22   aware of that vulnerability due to her mental illness and the

23   fact that it was a mitigating fact that he knows because he was

24   with her for over four years, in fact, he admitted that during

25   the e-mails.

1    So -- so, she's mentally ill, how did her mental

2    illness or her vulnerability contributed to the success of the

3    crime that he committed?

4         MS. EVE:  Well, in terms of the impact here in terms

5    of the cyberstalking, let's look at that, because everything

6    goes back to him using the Internet and him making the threats

7    and him pointing -- ah -- fingers at her, your Honor --

8         THE COURT:  All right.

9         MS. EVE:  -- all of that had an impact on Ms. Hannah.

10        And the success of -- of the cyberstalking had an

11   impact on her and she's here to testify, your Honor, as to the

12   effect that all of this had on her, the fact that she had to --

13   to be in -- I think, that the law enforcement officers visited

14   her, at least, three times --

15        THE COURT:  Right.

16        MS. EVE:  -- and she is prepared to testify to the

17   fact that in terms of the success, I mean, her mental illness

18   made her vulnerable but it's also taken her a significant period

19   of time to get over that.  So, the impact --

20        THE COURT: I -- I could understand that his crime,

21   regardless of whether she was mentally ill or not, impacted her

22   in some way.

23        But I -- I guess, the argument that counsel is making

24   and the test that I have to apply is the three -- the three-

25   pronged test and the third point being, how did her mental

1    illness or her vulnerability -- the language is pretty clear --

2    contributed to the success of the crime he committed?

3             MS. EVE:  Well, in terms of the fact --

4             THE COURT:  I mean, I understand that he -- that he

5    attempted to get her back by creating a crisis, I understand

6    that, but I don't -- still don't understand how her mental

7    illness played any nexus in -- in --

8             MS. EVE:  Well --

9             THE COURT:  -- in causing the crime --

10            MS. EVE:  -- well, I guess, that --

11            THE COURT:  -- or in -- in bringing about the crime or

12   the lack of success or success of the crime?

13            MS. EVE:  -- well, I guess, that it depends on how

14   you're defining the crime, if we're -- if the success is

15   accomplishing cyberstalking, then he accomplished that, your

16   Honor.

17            THE COURT:  But she didn't have to be mental --

18   vulnerable -- for him to be -- it's --

19            MS. EVE:  But the fact that she --

20            THE COURT:  -- she -- go ahead.

21            MS. EVE:  -- but the fact that she had a mental

22   illness, your Honor, made her particularly vulnerable in terms

23   of the success of the cyberstalking.

24            THE COURT:  It's not her -- it's not her -- it --

25   there is a test that I have to apply and that's my trouble,

1  there's a test, there is a three-pronged test, the last one

2  reads:

3          This vulnerability -- right -- meaning, the victim was

4  particularly susceptible or vulnerable to the criminal conduct.

5          This vulnerability or susceptibility facilitated the

6  defendant's crime in some manner, that is, there was a nexus

7  between the victim's vulnerability and the crime's ultimate

8  success.

9          She didn't have to be sick for him to do what he did

10  to her, harassing her by phone, it happens all the time --

11          MS. EVE:  Yes, your Honor, but --

12          THE COURT:  -- with normal people --

13          MS. EVE:  It's not a --

14          THE COURT:  -- I mean, as a sickening as it is, it

15  happens all the time.

16          MS. EVE:  It does, your Honor.

17          But the fact that this particular defendant given her

18  mental illness, it made her particularly, vulnerable to the

19  suggestions and the impact of the crime that the defendant

20  committed, where it may not have had --

21          THE COURT:  How -- walk me through how, how did it

22  make her vulnerable?

23          I -- I understand that what he did caused an impact, I

24  understand that, I understand, she was afraid, I understand that

25  she -- she -- because of mental illness, the impact of the crime

1    is pretty -- more serious -- than if she had not been ill, but

2    the question is, how her vulnerability contributed to the

3    ultimate success of the crime?  There has to be a nexus between

4    her --

5               MS. EVE:  Well --

6               THE COURT:  -- her mental illness and -- and the

7    crime, as --

8               MS. EVE: Well, your Honor, you're --

9               THE COURT:  -- as defense counsel has pointed out.

10              MS. EVE:  -- your Honor, given the fact that the

11   defendant does suffer from a mental illness, it's something that

12   law enforcement had to take into consideration when they're

13   investigating things.

14              If a person is just simply making allegations against

15   Person A and law enforcement goes and they interview Person A

16   and they deny that they're not in any of these things.  But

17   while investigating, they learn that Person A has a mental

18   illness, there is a certain level of -- it ratchets things up --

19   because they -- they take into account the fact that this person

20   has a mental illness when they are conducting their

21   investigation.

22              THE COURT:  All right.

23              I don't have any evidence of that, is the -- is the

24   agent prepared to explain that to me?  I mean, I -- I could

25   listen to it, can't -- do you have or have you talked to the --

1  the agent to shed some light on how her vulnerability, because

2  she -- they did talk to her and they talked to her in the course

3  of the investigation including -- you know -- confronting her

4  with -- with this information, explain to me, how this

5  vulnerability impacted the success of the crime.

6        MS. EVE: Your Honor, FBI Agent -- FBI Special Agent

7  Joseph Milligan will testify for you.

8        THE COURT:  Yeah.

9        I don't want to put him on the spot, but could you

10 consult with him, you know, I -- because it would be help -- it

11 would be helpful to me.

12       (Discussion held off the record at 9:49 a.m.)

13       MS. EVE:  I think, he will be prepared to testify

14 today, your Honor.

15       THE COURT:  All right.

16       ESR OPERATOR:  Please raise your right hand.

17       JOSEPH MILLIGAN, PLAINTIFF WITNESS, SWORN.

18       THE WITNESS:  I do.

19       ESR OPERATOR:  Please state your full name and spell

20 your last name for the record, please.

21       THE WITNESS:  Special Agent Joseph A. Milligan, Jr.,

22 Milligan is M-i-l-l-i-g-a-n and I am with the FBI.

23       ESR OPERATOR:  Thank you.

24                   DIRECT EXAMINATION

25       THE COURT:  All right, thank you for taking the

1    witness stand, I don't want to put you on the spot, but any --

2    any light you could shed on this -- on this point, will be

3    helpful to the Court.

4              THE WITNESS:  Sure, your Honor.

5              And I've taken over this case for the original case

6    agent, Herbert Lasco, but during the course of -- you know --

7    reviewing this -- this case, I know that talking to Herb, that

8    that became an issue that -- that, maybe, we looked at it -- or

9    Herb looked at it further, because a mental issue had come up

10   that, maybe, you'd have to scrutinize her more, that if she was

11   suffering from a mental-health issue, that she didn't do this,

12   ah, these crimes, you know, even though, maybe, you had the

13   evidence to the contrary, that maybe she didn't, because of

14   that, it needs extra scrutiny to look at it, that -- that she

15   didn't do these crimes, because of a certain mental-health

16   issue.

17             THE COURT:  Yes.

18             So, it made it more of -- it made the investigation

19   more difficult?

20             THE WITNESS:  Sure, sure.

21             THE COURT:  And -- because of her particular

22   vulnerability?

23             THE WITNESS:  That's correct, your Honor.

24             THE COURT:  So, when -- when -- so, in other words,

25   because of her vulnerability and her mental illness, you had to

Joseph A. Milligan, Jr. - Direct                    22

1   be really careful and cautious in the pursuit of the

2   investigation to determine whether, in fact, this crime was --

3   she committed the crime or not?

4                THE WITNESS:  That's true.

5                THE COURT:  So -- okay.

6                THE WITNESS:  And, your Honor, just -- you know, just

7   with our -- our job, in general, the FBI on a --

8                THE COURT:  But you would have not ignored it, even if

9   she -- the allegation, I mean --

10               THE WITNESS:  We would not have ignored the

11  allegations, but --

12               THE COURT:   -- the allegation.

13               THE WITNESS:  -- you'd certainly have to give a -- a

14  little more credibility, because you know, none of these crimes

15  actually ever came to fruition, so you -- you're kind of like,

16  well, maybe, it's somebody that -- because on any given day in

17  the FBI, if we have -- you know -- fifty telephone calls or

18  complaints, a major portion of them are from people that have

19  mental-health issues.  They just -- they're a beacon to the --

20  to the FBI for whatever reasons, that they are -- you know --

21  that they have these false crimes and all.  And you have to kind

22  of flush through that stuff.

23               THE COURT:  Okay.

24               So, you intensified the investigation be -- in other

25  words, you intensified the investigation because the -- the

Joseph A. Milligan, Jr. - Direct                           23

1    allegations may have some credibility?

2           THE WITNESS:  That's -- that's correct, your Honor.

3           THE COURT:  All right.

4           Anything else that you want to elicit from him to help

5    me --

6           MS. EVE:  No, your Honor.

7           THE COURT:  -- how her vulnerability which is the test

8    here, there's a nexus between the vulnerability and the crime's

9    ultimate success?

10          MS. EVE:  No -- no, your Honor.

11          I think that the -- that Agent Milligan has testified

12   to the fact that, because this particular individual had a

13   mental illness, that they -- they clearly investigated things

14   and they -- they went and they consulted with her and they

15   interviewed her with regard to the allegations in this case and

16   also looked into the -- the mental illness that she suffered

17   from.

18          THE COURT:  All right.

19          Do you have any questions, briefly?

20          MS. GAUGHAN:  Yes, Judge, just -- just very briefly.

21          THE COURT:  Okay, go ahead.

22                          CROSS-EXAMINATION

23   BY MS. GAUGHAN:

24   Q.  Agent Milligan, as the agent that took over this case, you

25   obviously had access to all the interviews and the recorded

1  audiotapes interviewed by the previous agents and officers

2  involved in this case, is that correct?

3  A.    That's correct.

4  Q.    In fact, I'm sure that you listened to the audio recording

5  of the conversation that the New Jersey agents had with Ms.

6  Hannah in the hospital, correct?

7  A.    Ah, I don't know if I listened to it fully, I may have spot

8  checked that.

9  Q.    Were you aware that during the course of the conversation

10  with her, they explained to her that as -- when threats come in

11  -- any and all threats must be thoroughly investigated, are you

12  aware of that conversation that the agents said to her in

13  speaking to her, specifically, about these allegations involving

14  her?

15  A.    I'm not aware of that particular conversation, but that is

16  certainly true.

17  Q.    And it's certainly also true as you have just stated to the

18  Court, that over fifty percent or what you've estimated to be

19  possibly fifty percent of the calls that you receive -- these

20  anonymous tips -- involve people that you believe may have a

21  mental illness, correct?

22  A.    That is correct.

23  Q.    So, you investigate all of these crimes, regardless of what

24  type of threat comes in, correct, as -- as the FBI, is that

25  right?

Joseph A. Milligan, Jr. - Cross                    25

1   A.   That is correct.

2   Q.   Because there is a possibility of any threat that may have

3   some legitimacy to it, is that an accurate statement?

4   A.   That is an accurate statement.

5   Q.   And so, because of that, you -- you're concerned with the

6   safety of the community, you investigate thoroughly all of these

7   allegations, correct?

8   A.   Well, not -- not thoroughly, if somebody calls up and says,

9   hey, something completely ridiculous and -- and you know, that

10  this is simply not -- not true, you're not going to -- you know,

11  that's not -- that's not possible, no, you wouldn't -- you

12  wouldn't investigate that.

13  Q.   Are you saying, you wouldn't investigate that at all?

14  A.   I wouldn't investigate somebody that calls up and -- and

15  makes a ridiculous statement, like, you know, I'm gonna blow

16  Mars up today, ah --

17  Q.   Well, I'm not asking you about that.  Let's -- let's --

18  A.   No, but you -- I answered your question, though.

19  Q.   Okay.

20       Just specific to this case, where there was

21  allegations of -- of things that could have plausibility, you

22  certainly wouldn't let that go --

23  A.   Absolutely, yes, yes.

24  Q.   -- correct?

25  A.   Yes.

Joseph A. Milligan, Jr. - Cross                                    26

1       MS. GAUGHAN:  Thank you.

2       THE COURT:  But if I understand it correctly, the

3  intensity of the focus on her, because of her mental illness and

4  because -- because as a result of her mental illness, she could

5  have committed this crime, has an impact?

6       THE WITNESS:  It does, your Honor, because in all

7  honesty, because of that variable, you -- you have to

8  scrutinize, even if you have other evidence to the contrary, you

9  still have to kind of really look at that component of it and

10  make sure that you've -- you've covered all of your bases.

11       THE COURT:  Right.

12       And it appeared to -- well, very well.

13       Thank you very much for your --

14       THE WITNESS:  You're welcome, your Honor.

15       THE COURT:  -- for your statement.

16       (Witness excused at 9:56 a.m.)

17       THE COURT:  Do you have any other evidence or she's

18  going to go to the -- to the sentence component not the

19  objection?

20       You said, you have the victim here prepared --

21  prepared to testify?

22       MS. EVE:  Yes, your Honor.

23       THE COURT:  Is she going to testify in support of the

24  -- of the objection, in opposition to the objection or what --

25       MS. EVE:  Well --

27

1          THE COURT:  -- or do you want to present her in

2    general?

3          MS. EVE:  Just in general, your Honor.

4          THE COURT:  All right, very well.

5          (Pause at 9:56 a.m.)

6          THE COURT:  Okay.

7          Attorney Gaughan, the -- the mental illness has an

8    impact, it's -- it's connected, is it not, because the -- as the

9    agent testified -- they were aware of the mental illness, they

10   have to be extremely cautious and scrutinize her more, because

11   of her mental illness and that's exactly what he did, because he

12   pointed it out, he tried to discredit her mental illness and all

13   of that --

14         MS. GAUGHAN:  Hm-hmm.

15         THE COURT:  -- so, that they can -- so, that it

16   impacts the ultimate success of the crime, the -- the

17   vulnerability.  He wanted to exploit that and in fact, he

18   engaged in a campaign to do that by undermining her.

19         And because the -- the federal authorities have to

20   really scrutinize this allegation, this is not a -- a lawyer,

21   you know, or a renown person, who -- who makes this allegation,

22   it's a person with a particular vulnerability that he was, isn't

23   that enough?

24         MS. GAUGHAN:  No, Judge, I -- under -- under that

25   standard, the success --

1          THE COURT:  Then under that standard nothing would be

2    enough?

3          MS. GAUGHAN:  Well, Judge, that's not -- that's not

4    true.

5          I -- from the Government's own evidence and from their

6    -- from the agent over -- almost fifty percent of these -- these

7    anonymous tips that they have come in, may have people that have

8    mental illness.

9          So, the -- the -- more investigations still does not

10   satisfy that third prong of the nexus between the success,

11   because regardless of the other fifty percent of the people that

12   call with anonymous tips on people that don't have mental

13   illness, they still are investigating that case.  The standard

14   is not how more thoroughly they investigate it, it's whether or

15   not, they would continue to investigate.

16          In this case under these circumstances in this

17   particular case, the third factor is simply not made out as to a

18   nexus between her vulnerability and the ultimate success of the

19   -- of the crime, that's the terrorist threats, it's just simply

20   not made out, that's the defense's position, your Honor --

21          THE COURT:  Very well.

22          MS. GAUGHAN:  -- respectfully.

23          THE COURT:  I -- I appreciate your defense position

24   and that -- and it's a -- I think, it's a close call in -- in my

25   view.

1    But with regards to the defendant's objection, let
2    me --

3

4         (Pause at 10:00 a.m.)
5         THE COURT:  Very well.
6         Let me -- I -- I disagree with the defense, I do think
7    that the Probation officer is correct in applying the two-level
8    enhancement under the Sentencing Guideline 3A1.1B1, this
9    enhancement may be applied as the Probation officer indicates
10   where the victim was particularly susceptible or vulnerable to
11   the criminal conduct, the defendant knew or should have known of
12   the susceptibility or vulnerability.
13        And this vulnerability or susceptibility facilitated
14   the crime in some manner -- in some manner, that is, where
15   there's a nexus between the victim's vulnerability and the
16   crime's ultimate success.
17        And I do think that here, the victim's mental-health
18   condition played a role in the investigation by the federal
19   authorities in to the alleged threats, because of her
20   vulnerability which he exploited, the Government intensified
21   their focus on her and there was heightened scrutiny, because of
22   her mental illness.
23        And I -- I think that based on this issue, this
24   enhancement applies.  They had been in a relationship for over
25   four years, lived together for a period of time.  And he not

1    only knew her really well and knew her mental condition, but in

2    the e-mails, he alluded to it and tried to discredit her, the

3    fact that she had this mental illness, so that the Government

4    could focus on -- on her and the complaint of discrediting her

5    intensified -- intensified -- the scrutiny that she received by

6    the authorities.

7            What is troubling about this case is the fact that,

8    you know, knowing full well her vulnerabilities, he engaged --

9    sort of in a campaign -- first by reporting to the local

10   authorities, the fact that she had been taking photographs of

11   her nieces in the nude and then, distributing them.

12           Following that, he intensified the campaign against

13   her by reporting to the state authorities and at every turn, it

14   got more aggressive including reporting it to the federal

15   authorities.

16           So, knowing full well of her vulnerabilities, he

17   intended to discredit her, to say that she was faking her mental

18   illness, so that the Government can find the anonymous tips that

19   he gave to be credible and prosecute her for these offenses,

20   whether ultimately it was successful or not, I -- I think it's a

21   question, but I think that the enhancement --

22           (Coughing at 10:03 a.m.)

23           THE COURT:   -- applies and, therefore, I will overrule

24   the defendant's objections and I will apply the two level

25   enhancement as correctly applied in this case.  If I am wrong,

1  the Third Circuit will tell me so.

2          In any event, let me then move on to the Government's

3  objections to the presentence investigation report.

4          You -- you concede that this is not an enumerated

5  crime of terrorism, it doesn't fit, this -- we cannot put a

6  square peg in a round hole, it does not meet the definition of a

7  crime of terrorism, any of the enumerated crimes, you'd concede

8  that?

9          MS. EVE:  I can -- I will concede that it does not

10  meet the definition of a federal crime of terrorism, but I

11  believe, your Honor, that this -- that the facts in this case,

12  may demonstrate certain -- certain actions by the defendant may

13  -- may meet the definition of a domestic act of terrorism or a

14  domestic terrorism as defined in Section -- Title 18, United

15  States Code, Section 2331(5)(c).

16          THE COURT:  So, you -- you think that under the -- the

17  Title 18, Section 2331(5), the term, domestic terrorism which

18  means something that involved or appears to be intended to

19  intimdate or coerce to the civilian population applies?

20          MS. EVE:  That and/or to influence the -- ah -- to

21  affect the conduct of a government.

22          Ah, in this case, we had the New Jersey State

23  troopers, one of them, who is present today, George Auge, who

24  had to respond to the Buena Vista Middle School in response to

25  the defendant's allegations that the victim in this case, Ms.

1   Hannah, intended to use guns and deploy pipe bombs at the middle

2   school.

3          The state trooper and other law-enforcement officers

4   acted in response to that threat, they went to the school, they

5   cleared out the school, they brought a dog in, that dog --

6          THE COURT:  I know what they did, but isn't this a

7   crime -- appeared to be intended?  I have to look at his state

8   of mind, not what happened.  You're giving me what happened, I

9   know what happened.

10         MS. EVE:  Well --

11         THE COURT:  You --

12         MS. EVE:  -- right --

13         THE COURT:  -- you're not focusing on -- I think, the

14  statute requires intent, the term, domestic terrorism means

15  activities that, either involve acts dangerous to human life

16  that are a violation of the criminal laws of the United States

17  or of any states -- dangerous to human life or be -- appeared to

18  be intended to intimidate or coerce to the civilian population,

19  intended to coerce or -- his crime is not intended to coerce or

20  -- or intimidate the civilian population, it was intended to get

21  her back to punish her.

22         MS. EVE:  Well, your Honor, there's certain actions,

23  yes, that were intended to get her back, but there can also be a

24  dual intent.

25         THE COURT: What is the dual intent here?

1          MS. EVE:  Well, your Honor, first to retaliate against

2    Ms. Hannah, the second --

3          THE COURT:  Right, that's her -- against her, not the

4    civilian population.

5          MS. EVE:  But, your Honor, by making a bomb threat or

6    a threat of --

7          THE COURT: He -- he didn't make a --

8          MS. EVE:  -- action --

9          THE COURT:  -- bomb threat, he's accusing her -- he's

10   accusing her -- because in his wicked mind, misguided mind,

11   however, evil he may be, he's thinking that if he can raise a

12   crisis for her -- and this is what, I think, comes through in

13   the presentence investigation report -- he will get her somehow

14   based on this sick relationship to come back to him --

15         MS. EVE:  Yes.

16         THE COURT:  -- that's his intent.

17         MS. EVE:  But by making a threat against a school, by

18   making a threat against a student at the school, your Honor,

19   that's intent to affect the kids at that school.

20              (Pause at 10:07 a.m.)

21         THE COURT:  I -- I, okay, go ahead, you may continue,

22   because you are asking me to focus on what happened and I know

23   that it is outrageous, the fact that as a result of the e-mail,

24   where he accuses her of -- or saying that she's going to put a

25   bomb in the school and accusing her brother as well as accusing

1   her mother and claiming that these are domestic terrorism or

2   Muslims, extremist and all of that.

3          That as a result the -- the school had to be shut down

4   for a period of an hour and four hundred students had to be --

5   had to be -- I understand all of that.

6          But it seems to me, that the term, domestic terrorism

7   means, the focus is on him, not the consequence of what he

8   did --

9          MS. EVE:  Well --

10         THE COURT:  -- it's his intent, not the consequence of

11  what did.

12         MS. EVE:  -- your Honor, the statute says:

13         Appear to be intended.

14         And this case, because it did involve not just Ms.

15  Hannan, but it involved the school and the individuals at that

16  school, we'd submit to the Court that that meets this

17  definition.

18         THE COURT:  And is that the only factual basis for the

19  support -- is that your only basis for supporting this

20  enhancement --

21         MS. EVE:  Well --

22         THE COURT:  I mean, this -- yeah, well, this -- the

23  application of this twelve-level -- to Counts 4 and 5?

24         MS. EVE:  Yes, your Honor.

25         I mean, that's the basis for the Government's request

1    for the upward departure.

2          We are not saying, that this is an act of federal --

3    that this is a federal crime that occurred, we're conceding that

4    that -- that the actions of the defendant do not meet that.  But

5    we are submitting to the Court, that this does meet the purpose

6    for the upward departure provision of Application Note 4.

7          THE COURT:  Well, which of the e-mails that you claim

8    support this -- this twelve-level enhancement or application --

9          MS. EVE:  Well, your Honor, we're relying --

10          THE COURT:  -- to Count 4 or Count 5 --

11          MS. EVE:  -- we're relying on --

12          THE COURT:  -- which e-mail?

13          MS. EVE:  -- we're relying on Count 4 and 5.

14          THE COURT:  Which e-mails, tell me?

15          (Pause at 10:10 a.m.)

16          MS. EVE:  Your Honor, I am going to direct your

17    attention to Paragraph 10, 13 and 14 of the presentence report.

18          (Pause continues.)

19          THE COURT:  10 -- say that again, 10?

20          MS. EVE:  10, 13 and 14 and I am looking for the other

21    one.

22          (Pause continues.)

23          THE COURT:  Is that 15, Count 3?

24          MS. EVE:  Paragraphs 13 and 14 pertain to Count 5 and

25    Paragraph 10 refers to Count 4.

1          And I do not have with me, the specific language for

2     the e-mail sent regarding the Buena Vista Middle School.

3          THE COURT:  That's the February 10, 2014, that's Count

4     3.

5          MS. EVE:  Yes.

6          THE COURT:  Where the e-mail reported that there was a

7     possibility of an attack at the Buena Vista Middle School in

8     Buena Vista Township, the morning -- that morning with a pipe

9     bomb and guns?

10         MS. EVE:  Yes, your Honor.

11         THE COURT:  All right.  All right, that's Count 3.

12         MS. EVE:  Yes.

13         THE COURT:  And that's your support -- those e-mails

14    -- those paragraphs for those counts -- is your support for

15    application of the two -- twelve-level to the base offense

16    level, creating -- I think -- a base offense level of twenty-six

17    and a change in the guidelines somewhat to sixty-three or

18    seventy-eight?

19         MS. EVE:  Yes, your Honor.

20         That would be if the Court were to allow all twelve

21    points.

22         THE COURT:  Forty -- right, forty-six to fifty-seven,

23    I think it would be since he's entitled to three credits.

24         MS. EVE:  Yes.

25         THE COURT:  Right?

1          MS. EVE:  Yes, your Honor.

2          THE COURT:  Okay, okay.

3          MS. EVE:  The upward departure asks for that total,

4    however, the Court -- we would -- we would ask for an upward

5    departure.

6          THE COURT:  I'm not dealing with the upward departure

7    now, I want to just deal with -- with your point, that you

8    disagree with the Probation officer's failure to apply this

9    twelve-level enhancement or these twelve points to the base

10   offense level of Counts 4 and 5 and even Count 3, I think,

11   you're saying, but do I understand that correctly?

12         MS. EVE:  Yes, your Honor.

13         THE COURT:  Did I get it right, I mean, is -- is that

14   your first objection?

15         MS. EVE:  Yes, your Honor.

16         THE COURT:  All right.

17         What is the defendant's response?

18         MS. GAUGHAN:  Your Honor, Application Note 3A1.4 is --

19   it is an extreme steep enhancement and it's designed

20   specifically to address issues that involve and satisfy the

21   definition of federal crime of terrorism.

22         The Government has already conceded that the two

23   charges that Mr. Handy is -- they were concentrating on -- are

24   not -- do not fit within the definition of a federal crime of

25   terrorism, that --

1    THE COURT:   That's Count 4 and Count 5 --

2    MS. GAUGHAN:   Correct.

3    THE COURT:   -- those charges --

4    MS. GAUGHAN: Right.

5    THE COURT:   -- I agree.

6    MS. GAUGHAN:   So -- so, that -- in order for that --

7    for that enhancement to apply, not only does it have to fit

8    within the enumerated offense, but there has to be a second

9    showing that the -- the offense was calculated to influence or

10   affect the conduct of the Government by intimidation or coercion

11   or to retaliate against Government conduct.

12        So, because both of them are not satisfied, they're

13   not, either or they're both.  So, that enhancement for that

14   reason does not apply.  However, the -- the structure of the

15   actual enhancement does allow the courts to look to, if the

16   offense was intended to promote a federal crime of terrorism.

17        And in all of the cases that --

18   THE COURT:   She is saying a federal crime or a state

19   crime.

20   MS. GAUGHAN:   No, a federal crime, your Honor, I'm --

21   a federal crime, that is what's required and --

22   THE COURT:   Right, I --

23   MS. GAUGHAN:   -- a federal crime of terrorism.

24        And what the courts have looked to, if in fact as --

25   as is true in this case -- the Government has conceded that the

1  statute of which Mr. Handy has been convicted of or pled guilty

2  to is not an enumerated offense.   It becomes the burden of the

3  Government to establish that Mr. Handy's intention -- his

4  purpose -- was to promote dom -- to promote federal -- a federal

5  crime of terrorism.

6          And what the courts have looked to as the -- as this

7  Court has accurately stated -- is that you'd need to look at the

8  intent, the intent, the purpose, what was the purpose of Mr.

9  Handy doing the things that he did?

10          And I would submit to you, your Honor, the evidence in

11  this case is overwhelming that he made allegations,

12  specifically, against her, that he made those allegations at a

13  time after they had a tumultuous breakup, that the intention of

14  Mr. Handy at that point -- very misguided, very dumb, very

15  reckless, all of those things -- were not -- were to,

16  specifically, have -- get her in trouble, put a crisis situation

17  to her to bring him back.

18          So, you have to look at what his intent is, because

19  that is the burden of the Government to prove by a preponderance

20  of the evidence that Mr. Handy intended to promote a -- to

21  promote this type of terrorism.   He simply did not, your Honor.

22          In this case, there is no evidence whatsoever that Mr.

23  Handy did anything that was involved in any type of terroristic

24  extremist groups, none of that.   He put this information out for

25  the reason, that he wanted her -- unfortunately, misguided and

1   otherwise -- to get in trouble with the authorities.

2          In his mind, he was thinking that this was a

3   situation, where in the past when she was involved in a crisis

4   situation, she came to him, he was acting out of hurt, he was

5   acting out of stupidity, out of jealously, all of those things,

6   but that was his intention.

7          And we know that that was his intention, because even

8   after -- when Mr. Handy was arrested and charged with this case

9   -- he made a statement to the agents in this case and the agents

10  note:

11         Handy regrets sending the anonymous false complaints

12     about Hannah.

13         He let his emotion over their breakup get the best of

14  him, none of the allegations to include the drug, bomb and child

15  porn allegations were true.  A few months ago, he might have

16  been happy that his false complaints caused Hannah trouble with

17  the FBI and the police, but now he regrets what he did, he wants

18  everything to be over with, he does not want to go to jail.

19         So, all of the evidence points to that his intention

20  was to -- to retaliate against Hannah, all of the evidence

21  including his own statement to the FBI supports that.

22         So, the promotion of the domestic terrorism aspect

23  which is essential and the burden is on the Government by a

24  preponderance of the evidence to produce such evidence, it's

25  clearly not made out here.

1          And in fact, when -- when these types of enhancements

2    are requested because they are so steep, because they are so

3    serious and the majority of the cases that I've looked to

4    involve these enhancements, where there are members of an

5    extremist group.

6          The most recent case that I was able to find was

7    United States versus Fidse, F-i-d-s-e, cited at 862 F. 3rd, 516,

8    a 2017 case from the Fifth District, demonstrated that in cases

9    where -- such as this -- there is not an enumerated -- the -- it

10   doesn't fall under the enumerated provision of the -- the

11   terrorism cases, that -- that they're -- that what the Court

12   must do -- the District Court -- one, they must identify which

13   enumerated -- federal crime of terrorism the defendant intended

14   to promote.  Again, that is the Government's burden.

15         Two, they must satisfy the elements of two --

16   2332(b)(5)(a), which requires that the offense be -- quote --

17   calculated to influence or affect the conduct of the Government

18   by intimidation or coercion or retaliate against Government

19   conduct.

20         And three, they must be able in this courtroom to

21   support its conclusions by a preponderance of the evidence from

22   facts on the record, that is simply not demonstrated in this

23   case, your Honor.

24         And I -- I won't go into my argument at this point

25   unless the Court wants me to -- well, I'll wait for the

1   Government's argument about this upward departure, which equally

2   is inapplicable under the facts and the circumstances of this

3   particular case.

4          THE COURT:  Very well.

5          They also argue -- and you might as well give me your

6   argument, I -- I suspect it might be the same argument -- they

7   also argue that if -- if this doesn't apply, then -- then, I

8   should apply an upward departure under the guidelines.  I think,

9   they cite me to 3.8 -- 381.4.

10         MS. GAUGHAN:  They -- they cite you, your Honor, for

11  their position that an upward variance -- or an upward

12  departure, excuse me -- is applicable, specifically, regarding

13  the language contained in Application Note 4, which again, is

14  equally inapplicable in this case.

15         Now, they -- and I'm not quite sure, that I completely

16  understand the Government's argument -- because in their

17  objection in the presentence report and what they've stated in

18  the presentence report, their objection included --

19         (Pause at 10:20 a.m.)

20         MS. GAUGHAN:  -- they were arguing as part of their

21  written objection, that Application Note 4 should apply because

22  the conduct charged in Count 4 was designed to intimidate or

23  coerce the civilian population, as such the Government intends

24  to seek an upward adjustment to the conduct charged in Count 3

25  or 4.

1    Well, that clearly is not the case in this -- in this

2 circumstance.  If -- if Mr. Handy wanted to influence the

3 civilian population, he could have called a bomb threat in to

4 the school and said, she was the one who was doing this.  He

5 didn't do that, he didn't infect the population -- the civilian

6 population.

7    Clearly of course, the -- the police did go out and

8 they did investigate and they did clear the school for an hour,

9 but that does not fit the requirement under this application

10 note for an upward departure, which is extremely serious in this

11 case, I mean, these -- this note deals with cases of terrorism.

12    And the Government in its pre -- in its actual

13 argument in the sentencing memo makes reference in its Page 13

14 towards the bottom when identifying these various e-mails:

15         Such actions were inevitably designed to influence

16      or affect the conduct of a law-enforcement officer by

17      means of intimidation or coercion to act in response to

18      the threats.  As a result, the Government seeks an

19      upward departure according to Application Note 4.

20    That's not the standard, Judge, it doesn't involve the

21 -- the intimidation or coercion of law enforcement, that's not

22 what the standard is in the application note, it requires the

23 imitation -- or intimidation and coercion of the Government or

24 in retaliation of the Government's policies, especially, in

25 cases of terrorism, where terrorist groups, ISIS group or

1   different -- El Shabazz -- are retaliating for the Government's

2   policy with regards to Israel and the Palestine, for an example.

3           Those are what you're talking about when you're

4   talking about the enhancement under this application note.  And

5   the facts that -- that the police in this case or the law

6   enforcement had to react to threats, does not satisfy that

7   application.

8           I mean, to -- to go with the Government's theory or --

9   or belief -- then -- then -- and again, the cases all say that

10  they're -- that these -- this application and this -- and

11  whether you're moving for an upward departure under the

12  application note or the actual application of the twelve-level

13  enhancement, requires specific, strict information regarding

14  that it is, in fact, a -- a crime of terrorism and that the

15  intent was, if -- if it's not an enumerated offense -- which

16  it's not here -- that the intent was to promote it.  It simply

17  is not here in this case.

18          If the Government -- judging by what the Government is

19  asking this Court to do, if a situation which it was a Hobbs Act

20  robbery, for example or a bank robbery, if an individual goes in

21  to a bank and robs the teller and says, hey, you know what, I --

22  I have planted a bomb in here and if you notify the authorities

23  within five minutes, that bomb will go off and I'll know that.

24          Now, obviously, when the authorities come, this teller

25  is going to say, oh, my God, this person said that there was a

Case 2:16-cr-00354-JS   Document 36   Filed 04/02/18   Page 45 of 118

45

1    bomb in here, the -- the bank would be evacuated, the civilians

2    in the nearby stores, perhaps, would be evaluated -- or

3    evacuated -- and they would look for this alleged threat of this

4    bomb.

5         It could be in any number of scenarios, if you'd take

6    the Government's position that this application in -- in these

7    facts, in the circumstances of this case applies.  It simply

8    does not, your Honor.  It simply just does not apply in this

9    particular case, because the intent of Mr. Handy as -- as

10   misguided and bad as it was -- was simply borne out of the

11   desire to get her in trouble, the desire in the warped sense of

12   how he was thinking to get her back, to have her come back to

13   him, all of those things, none of which -- none of which -- was

14   he designing to promote any act of terrorism and that's what's

15   required -- that's what's required.

16        And it is on the burden of the Government to produce

17   evidence of all of that by a preponderance of the evidence and

18   they simply have not done that in this case, your Honor, because

19   quite frankly, the facts just don't support it, they simply

20   don't.

21        THE COURT:  Very well.

22        Attorney Eve, she's given me her argument in

23   opposition to your request for me to keep this as a domestic-

24   terrorism crime, adding the two-level increase to the base

25   offense level of Count 4.  And she has responded to your request

1    for a motion for an upward departure, do you want to respond --

2            MS. EVE:  Yes, your Honor.

3            THE COURT:  -- to that -- to the motion for a

4    departure?

5            MS. EVE:  Well, let me reiterate, your Honor, when I

6    began my discussion, I -- I think, one of the first things that

7    I said was that the Government was conceding that this was not a

8    federal crime of terrorism.

9            And so, we were abandoning the position that there

10   should be the twelve levels added as we had initially indicated

11   in our objections to the presentence investigation report.

12           Our position though is that --

13           THE COURT:  So, you're conceding that -- that -- so --

14   I understood you to be making two objections, one, was that the

15   Probation officer did not properly account for the twelve level

16   -- twelve-level enhancement to Count 4 bumping it to a base

17   offense level of twenty-six.

18           And -- and you do understand that that would require a

19   -- it doesn't meet the definition of a crime of terrorism --

20           MS. EVE:  I am -- I am conceding that, your Honor.

21           THE COURT:  -- so, you concede that for purposes of

22   Count 4 and 5?

23           MS. EVE:  Yes, your Honor.

24           THE COURT:  All right.

25           Then, you are arguing to me, that -- you're conceding

1   that objection -- but you're saying, but I am asking you to

2   depart upward, not that it -- that it meets the definition of a

3   federal crime or terrorism but under the definition that we

4   talked about earlier --

5          MS. EVE:  Yes, your Honor.

6          THE COURT:   -- it's a domestic-violence crime, do

7   I understand you correct?

8          MS. EVE:  Yes, your Honor.

9          THE COURT:  So, I don't have to rule -- I want you to

10  make it abundantly clear, because I -- the Probation officer

11  went to great lengths in the presentence investigation report,

12  if you'd remember, telling me your -- in response to your No. 1

13  objection, telling me how he calculated the guidelines.  And

14  then, explaining to me, why he did not distinguish the

15  applicable guidelines to Counts 2 and Count 3, which you concede

16  and why he did not distinguish at that time, the applicable

17  guidelines to Counts 4 and Count 5, essentially -- basically,

18  telling me that those -- he didn't find that those two things

19  apply, you concede that, right?

20         MS. EVE:  I -- I took issue with the analysis done by

21  the Probation office, your Honor.

22         But I am saying that for purposes of calculating the

23  guidelines, we are conceding that the defendant's actions did

24  not -- for Counts 4 and 5 -- did not count -- constitute a

25  federal crime of terrorism.

1          THE COURT:  So, the Probation officer did not apply

2    those guidelines, you agree with that --

3          MS. EVE:  I agree --

4          THE COURT:  -- right?

5          MS. EVE:  -- yes, your Honor.

6          THE COURT:  Okay.

7          Now, I understand that you then are saying -- but I

8    think an upward departure is appropriate, but that's a different

9    issue, right?

10          MS. EVE:  Yes, your Honor.

11          THE COURT:  And that's the issue that you want me to

12    address?

13          MS. EVE:  Yes, your Honor.

14          THE COURT:  You heard Attorney Gaughan's argument

15    that, essentially, it still doesn't get a -- doesn't get around

16    and that this is to be applied in extraordinary circumstances

17    regarding crimes of terrorism, if I understood her correctly.

18          MS. EVE:  Well --

19          THE COURT:  So, tell me, why should I apply this --

20    why should I give you an upward departure under the -- the Note

21    4 of the Sentencing Guideline 3A1.4?

22          MS. EVE:  Well, your Honor, first of all, with regard

23    to the upward-departure provision, it clearly indicates an

24    offense other than one of the offenses, specifically enumerated

25    under Title 18, United States Code Section 2332(b)(g)(5)(c).

1        We'd concede that there is not an action by the

2   defendant, which meets one of those specifically enumerated

3   offenses.   However, we'd submit to the Court that the

4   defendant's actions appear to be intended as indicated in Title

5   18, United States Code Section 2331(b), I'm -- I'm sorry --

6   (5)(b) -- that the defendant's action appears to be intended to

7   intimidate or coerce a civilian population, because they were

8   actions that were specifically directed towards the victim in

9   this case acting at the Buena Vista Middle School, which caused

10  the New Jersey State Police and other law-enforcement officers

11  to act.

12        So, you have not only actions by defendant which were

13  -- influenced the conduct of the Government in terms of the law-

14  enforcement officers, their response, but you also have a

15  civilian population that appeared to be intended to be

16  influenced by the defendant's threats, because that civilian

17  population appeared to be intended -- like I indicated

18  previously -- there was a dual intent here, there was --

19        THE COURT:  You -- she makes a very compelling

20  argument as to how to apply the comment -- the Comment 4 to

21  Count -- in terms of the upward departure and that is, that he

22  did not say on her behalf, that he -- he was going to put a bomb

23  in the school.  And, you know, as an act of terrorism in protest

24  to -- to some official Government action and all of that.

25        I -- that what he did is, say something that may

1   cause, you know, an investigation -- may cause of him -- but

2   not, necessarily come within the purview of Application Note 4,

3   isn't that a compelling argument?

4          MS. EVE: I -- I disagree, your Honor.

5          I mean, the -- if -- Application Note 4 is broad and

6   it does not indicate that -- first of all it says, it doesn't

7   have to be one of the specific -- the specific -- specifically,

8   enumerated offenses.

9          But it goes to the fact that an offense was calculated

10  to influence or effect the conduct of the Government by

11  intimidation or coercion.  You're indicating that the victim in

12  this case is planning on going in to the school on a specific

13  date with pipe bombs and with guns going to affect a civilian

14  population in New Jersey.

15         So, while it may not meet the definition of a federal

16  crime of terrorism, it certainly meets the definition of

17  domestic -- domestic terrorism as specifically definite under

18  Section 2331.

19         The -- the -- what the defendant in his mind intended

20  is one thing, but the specific -- the -- it says specifically

21  under 20 -- 2331, appeared to be intended, not actual intent,

22  but appearance of intent.  And one cannot ignore, the defense

23  representations as specific as they were and the result.

24         And for that reason, your Honor, we'd submit to the

25  Court that the facts of this case by a preponderance of the

1    evidence justify the upward departure being requested by the

2    Government.

3              (Pause at 10:33 a.m.)

4              THE COURT:  Very well.  I think, I understand.

5              Anything else, so --

6              MS. GAUGHAN:  Your Honor, I would just in -- in

7    closing on that issue, I would just say, I completely disagree

8    with the Government, that is not a broad statute, it's a very

9    limited application note, it's not to be interpreted broadly at

10   all, it's to be --

11             THE COURT:  Well, criminal statutes have to be

12   interpreted narrowly --

13             MS. GAUGHAN:  No, no, no, no, no --

14             THE COURT:  -- anyway.

15             MS. GAUGHAN:  -- I'm sorry, not the criminal statute,

16   I'm talking about the application note --

17             THE COURT:  Oh, the note, yes.

18             MS. GAUGHAN:  -- she said that -- I -- that of course,

19   is to be interpreted strictly.

20             I am talking about the application note, it's not a

21   broad note at all, there is specific requirements that the

22   Government has absolutely failed to establish.

23             THE COURT:  Very well.

24             I -- so, if I understand it correctly, just so that

25   the record is abundantly clear.

1          The first objection that you had to the presentence

2     investigation report, where the Probation officer clarified that

3     he did not distinguish -- distinguish between Count 3 and Count

4     1 and that he did not distinguish between Count 4 and 5, because

5     he did not find that the application of the twelve-level

6     enhancement to Count 4 or Count 5 applied, since this was not an

7     enumerated count of terrorism, that -- that you are withdrawing

8     that objection and I don't have to rule on that -- that does not

9     -- it does not apply, right?

10          MS. EVE:  Well, your Honor, the Government and --

11          THE COURT:  I'm trying to clarify to see what it is,

12    that you are asking me to rule, because you seem to be conceding

13    something to me, that I don't have to address.

14          And that what you are focusing on, is the request for

15    an upward departure, you'd want me to rule on?

16          MS. EVE:  Yes.

17          THE COURT:  All right.

18          So, in terms of the upward departure under the

19    sentencing guidelines -- the Sentencing Guideline 3A.14, I

20    understand your position.  I have reviewed the presentence

21    investigation response to your position with regards to the --

22    the application of the upward departure under the guidelines,

23    Application Note 4.

24          I have heard the defendant's response in opposition to

25    applying Note 4 and I agree with the defense, that the

LASER BOND FORM A    ®    PENGAD • 1-800-631-6989 • www.pengad.com

1   application of an upward departure under the Sentencing

2   Guideline 3A.14, Application Note 4 is not warranted or

3   appropriate under the particular circumstances of this case.

4            I will put out an order explaining that in terms of

5   the factual predicate for my ruling with regards to what the

6   Government is insisting that applies to this case.

7            And I will incorporate by reference as adequately set

8   forth fully in -- in the record, also, the Probation officer's

9   response to the Government's objections to the presentence

10  investigation report on Pages 18, 19, 20 and -- and Pages 20.

11           Similarly, with regards to the defendant's objection

12  to the two-level enhancement pursuant to Sentencing Guideline

13  3A1.1B1, which I've already ruled -- overruled -- the objection.

14           I will also incorporate by reference the Probation

15  officer's response to the defendant's objection further

16  supplemented by what I've heard on the record.

17           And I will put out an order to that effect, so that

18  the -- the record is abundantly clear as to my ruling on these

19  objections by the defendant and the objections by the

20  Government.

21           And with that, I believe, that the guidelines were

22  properly calculated by the Probation officer, including the two-

23  level enhancement for the victim's vulnerability and,

24  accordingly, the guidelines application here are as follows:

25           The guidelines that apply based on my rulings is

1    outlined in Paragraph 63 based on an offense level of twenty-one

2    and a Criminal History Category of I, the guidelines for

3    imprisonment in this case, it gives me a range of thirty-seven

4    months to forty-six months.

5         With that, I think then I am prepared to hear argument

6    on the -- on the 3553(a) factors and I believe that the

7    Government has witnesses, but does the defense have any

8    witnesses to present?

9         MS. GAUGHAN:  Your Honor, my mother -- my client's

10   mother and father are present in the courtroom, I'd -- they are

11   both supportive of their son.  I don't know whether I will be

12   calling them, it's -- it depends on what is elicited from the

13   Government --

14        THE COURT:  Okay, fair enough.

15        MS. GAUGHAN:  -- so, I can't answer that at this time.

16        THE COURT:  Fair enough.

17        So, I am going give the Government an opportunity to

18   present any witnesses, they'd want in aid of a sentencing in

19   this case.  Ms. Eve.

20        MS. EVE:  Your Honor, the Government calls Zire

21   Hannah.

22        ESR OPERATOR:  Please raise your right hand.

23        ZIRE HANNAH, GOVERNMENT WITNESS, SWORN.

24        THE WITNESS:  Yes.

25        ESR OPERATOR:  Please state your full and spell your

1    last name for the record, please.

2                THE WITNESS:  Zire Hannah.

3                        DIRECT EXAMINATION

4    BY MS. EVE:

5    Q.   Ms. Hannah, why don't you pull your seat forward, so you

6    can get closer to the microphone.

7    A.   Hm-hmm.

8    Q.   And try to speak in to the microphone.

9    A.   Okay.

10   Q.   Please state your name.

11   A.   Zire Hannah.

12   Q.   Ms. Hannah, how old are you?

13   A.   Twenty-two.

14   Q.   And you are currently a resident of New Jersey, is that

15   right?

16   A.   Yes.

17   Q.   And do you know the defendant, Matthew Handy?

18   A.   Yes.

19   Q.   How do you know Mr. Handy?

20   A.   Ah, we were in a relationship together for four years.

21   Q.   And at the time that you were in the relationship, were you

22   physically living in the same location during that four-year

23   period of time?

24   A.   At first, no, we weren't, but as the relationship went on,

25   yes, I was staying with him.

1  Q.    All right.

2          And how long did you stay with the defendant?

3  A.    Ah, not -- not too long, because then I went into a

4  shelter.

5  Q.    Okay.

6          Why did you go into the shelter?

7  A.    Because his mother found out that I was staying with him

8  and I had to leave.

9  Q.    Okay.

10          And at the time that you were -- you were in the

11  relationship with Mr. Handy, were you under the care of a

12  physician?

13  A.    Yes.

14  Q.    And what kind of physician?

15  A.    Ah, I was being seen by a psychiatrist at the time, as --

16  when we were together, because I suffer from depression and

17  anxiety.

18  Q.    Okay.

19          And Mr. Handy was aware of this?

20  A.    Yes.

21  Q.    And given the fact that you were in a four-year

22  relationship with Mr. Handy, would you -- is it fair to say that

23  you thought you knew him pretty well?

24  A.    Yeah -- yes.

25  Q.    And what -- what was the age difference between the two of

Zire Hannah - Direct

1   you?

2   A.   We were three years, I was sixteen when I met him, he was

3   eighteen.

4   Q.   Okay.

5        And at what point -- how old were you when you were

6   living with him?

7   A.   I was seventeen years old.

8   Q.   Were you in school?

9   A.   Yes, I was.

10   Q.   And what -- what school were you attending?

11   A.   Buena Regional High School.

12   Q.   The -- the relationship just -- do you know if you were Mr.

13   Handy's first girlfriend?

14   A.   No, I wasn't, he told me, I wasn't.

15   Q.   And what did he tell you about previous relationships that

16   he'd had?

17   A.   Ah, he told me that he had -- he has done things to them,

18   cheated on them, lied to them, they lied to him, it was what the

19   relationship was, he told.

20   Q.   Okay.

21        Was Mr. Handy working at that time that you were

22   involved with him?

23   A.   No.

24   Q.   When you were living with him, he wasn't working at all?

25   A.   Yes.

Zire Hannah - Direct

1   Q.   Oh, he was?

2   A.   When I staying with him, he was.

3   Q.   And where was he working?

4   A.   Ah, Acme, I think.

5   Q.   Do you know what he did at Acme?

6   A.   Ah, he worked in the deli.

7   Q.   Was Mr. -- in addition to working, do you know if Mr. Handy

8   was in school?

9   A.   No.

10   Q.   Do you know, if he had graduated from high school?

11   A.   Yes.

12   Q.   He told you that?

13   A.   Yes.

14   Q.   Do you know if he pursued any post-high school education at

15   all?

16   A.   Ah, he told me, he went to college to be a music producer,

17   I don't even know if that was true.

18   Q.   The -- the -- I lost my train of thought.

19        During the time that you were living together, did Mr.

20   Handy handle his own business affairs, like, bills, things like

21   that --

22   A.   No.

23   Q.   -- that you were aware of?

24   A.   No.

25   Q.   Did he drive?

Zire Hannah - Direct

1  A.   No.

2  Q.   And I'm sorry, how long a period of time was it that you

3  lived with him?

4  A.   We lived together for, I'd say, about five -- five, six

5  months --

6  Q.   All right.

7  A.   -- no longer than that.

8  Q.   And while you were living with Mr. Handy, were you leaving

9  -- were you leaving the house to go to work or go to school?

10  A.   No.

11  Q.   You just stayed in the house?

12  A.   Yes.

13  Q.   Did you ever observe Mr. Handy using the computer for any

14  reason?

15  A.   Yes.

16  Q.   And how would you describe his knowledge in terms of the

17  computer usage?

18  A.   He was very smart.

19  Q.   Can you be more definitive?

20  A.   Like, meaning if something was wrong with the computer,

21  he'll be able to fix it with no problem.

22  Q.   And did you ever see him -- ah -- you know, going on --

23  accessing any particular website with regularity?

24  A.   No.

25  Q.   During the course of this case, the agents found e-mail

Zire Hannah - Direct

1   conversations --

2   A.   Yes.

3   Q.   -- between you and Mr. Handy --

4   A.   Yes.

5   Q.   -- were there any conversations that the agents showed you

6   that you did not engage in with Mr. Handy?

7   A.   No.

8   Q.   After you moved out of Mr. Handy's home and into the

9   Salvation Army, did you continue your relationship even though

10  you'd moved out?

11  A.   Yes.

12  Q.   And did -- and when you were living at the Salvation Army,

13  how did you communicate with Mr. Handy?

14  A.   Ah, I had Government -- when I was receiving food stamps at

15  the time.

16  Q.   Okay, all right.

17       And what caused the end of your relationship with Mr.

18  Handy?

19  A.   Ah, he thought I was lying, cheating on him when I was

20  staying at the Salvation Army.  And it was my time to leave from

21  the Salvation Army, so I called him and told him, I -- I'm

22  leaving.

23       And when I was at the train station in Chester, he

24  asked me, don't go, do not leave, I'll find us a place to go.

25  Q.   And what happened afterwards?

Zire Hannah - Direct

1    A.   I left.

2    Q.   Okay.

3         And you went where -- to New Jersey?

4    A.   Yes.

5    Q.   After you went back to New Jersey, did you still stay in

6    contact with Mr. Handy?

7    A.   Yes.  We stayed in contact for a short period of time.

8    Q.   Okay.

9         And -- and who stopped the communication between the

10   two of you?

11   A.   Well, I was getting -- I had to get surgery, then I had my

12   appendix remove.  And I had called him and told, I was getting

13   surgery done, he thought I was lying, didn't hear from him.

14        Then, on his birthday, which I woke up from the

15   surgery on that day, I called him and told him, I was done with

16   surgery and he broke up with me.

17   Q.   Okay.

18        And while you were in the hospital for -- for that

19   surgery, were you visited by law-enforcement officers?

20   A.   Yes, I was.

21   Q.   And as a result of the -- the -- do you recall what it was

22   that the law-enforcement officers questioned you about?

23   A.   Excuse me?

24   Q.   Do you recall what it was that the law-enforcement officers

25   questioned you about, why were they there?

Zire Hannah - Direct

1   A.   Because they said that they had got a -- received a call,

2   an anonymous tip saying, that me and my little brother was going

3   to blow up his school.

4   Q.   Had you ever told Mr. Handy that you had planned to do

5   that?

6   A.   No.

7   Q.   Had you ever told Mr. Handy that you were building pipe

8   bombs?

9   A.   No.

10  Q.   Did Mr. Handy ever see you building pipe bombs?

11  A.   Yes.

12  Q.   Were you shown the e-mails that were sent by Mr. Handy to

13  various law-enforcement agencies?

14  A.   No.

15  Q.   The school that your brother attended, the Buena Vista

16  Middle -- or had attended three or four years ago -- was the

17  Buena Vista Middle School, is that right?

18  A.   Correct.

19  Q.   And do you recall an incident in which your brother got

20  suspended from school?

21  A.   Yes.

22  Q.   And do you recall why that was?

23  A.   Because of the threats, the bomb threats.

24  Q.   And was your brother -- to your knowledge -- doing anything

25  with regards to bombs?

1  A.    No.

2  Q.    Was any member of your family, doing anything with regard

3  to bombings?

4  A.    No.

5  Q.    Had Mr. Mr. Handy ever told you that he knew how to build a

6  bomb?

7  A.    No.

8  Q.    Had Mr. Handy ever told you, he's been involved in any

9  criminal activities?

10  A.    Yes.

11  Q.    And what did he tell you?

12  A.    He told me, he was in a gang, he told me, he had guns, he

13  told me, his dad had guns.  He told me, his brother had guns,

14  they were in to the street life.

15  Q.    Did you believe Mr. Handy?

16  A.    Yes, I believed him.

17  Q.    When these threats were being made about you, did you have

18  any fear of Mr. Handy?

19  A.    I didn't know what was gonna happen next.

20  Q.    And how did that affect you?

21  A.    Ah, I wasn't going to school, wouldn't come out of my room,

22  I isolated myself.

23         I had to go to a crisis center, because I tried to

24  kill myself because of him.

25            (Pause at 10:50 p.m.)

Zire Hannah - Cross

1   BY MS. EVE:

2   Q.   Ms. Hannah, should I get you -- would you like some water?

3   A.   No.

4   Q.   You're okay?

5   A.   (No verbal response.)

6        MS. EVE: Your Honor, I'd have no further questions.

7        THE COURT:  Do you have any questions?

8        MS. GAUGHAN: I -- I do, your Honor.

9        THE COURT:  Okay.

10                   CROSS-EXAMINATION

11  BY MS. GAUGHAN:

12  Q.   Good morning, Ms. Hannah.

13  A.   Good morning.

14  Q.   Ms. Hannan, when -- when you first met Matthew, you met on

15  a social media site, is that correct?

16  A.   Yes.

17  Q.   And then, you and he started talking, chatting on -- on

18  that social media --

19  A.   Yes.

20  Q.   -- is that correct?

21  A.   Yes.

22  Q.   And there was a period of time, where you and he talked

23  for quite a -- a while -- before you even actually met, isn't

24  that true?

25  A.   Yes.

Zire Hannah - Cross

1  Q.   And when you -- when you were talking with Matthew, you

2  were telling -- at this time, you're sixteen years old, correct?

3  A.   Yes.

4  Q.   You're in your senior year of high school, is that right?

5  A.   No.

6  Q.   You were in your junior year of high school?

7  A.   No, I was a sophomore.

8  Q.   A sophomore.  Okay.

9        So, you and he talked for almost a year before you

10  actually went and moved in to his home, where he lived with his

11  mother and father, is that correct?

12  A.   Yes.

13  Q.   But before you actually moved in, you had had a lot of

14  conversations with Matthew, describing a really terrible home

15  life that you were having, problems with your mom, problems with

16  your brother, problems at your house, right?

17  A.   Correct.

18  Q.   And you would tell him about all of these instances that

19  were occurring, that were abusive and you asked him, if you

20  could come and live with him, right?

21  A.   Correct.

22  Q.   And when you detailed all of these things you said were

23  going on and you and he finally met and you moved in about a

24  year later, you came in to his house, his bedroom is on the

25  second floor of their home, correct?

Zire Hannah - Cross

1   A.   Yes.

2   Q.   And you and he hid, the fact that you were living there,

3   right, his mother and his father, they had no knowledge that you

4   were in the house living in that room, is that right?

5   A.   At first, he told me that his mother said, I can stay --

6   Q.   Ah --

7   A.   -- that's the reason why I left my home to go stay with

8   him --

9   Q.   I --

10  A.   -- and then, when I got there, he told me, his mother did

11  not want me staying there.

12  Q.   Okay.

13       But you continued to secretly live there, right?

14  A.   Yes.

15  Q.   And, in fact, during that period of time, you weren't going

16  to school in New Jersey, because what -- your answer to the

17  Government's question was -- you -- you didn't go to school at

18  that time, am I correct in that?

19  A.   No.

20       Yes, you are correct, I wasn't in --

21  Q.   Okay.

22  A.   -- school.

23  Q.   Okay.

24       So, you stayed in the home and then, at some point in

25  time, maybe, about four months or so in to this, his mom found

1  out that you were staying there and confronted both you and

2  Matthew, is that correct?

3  A.   Yes.

4  Q.   And when she confronted you and she confronted Matthew, she

5  explained to you, that this was not a good situation and you

6  could not remain living in that house, is that right?

7  A.   Correct.

8  Q.   And she -- his mother, Ms. Donna Handy -- made arrangements

9  for you with a woman, named Ms. Burgoes (ph) from Catholic -- or

10 excuse me -- from Catholic Charity to make arrangements to get

11 you in to the Salvation Army homeless shelter, isn't that also

12 true?

13 A.   Yes.

14 Q.   And in fact, you were told by Ms. Burgoes from Catholic

15 Services, that initially, they didn't have room at the Salvation

16 Army but they were going to make room, because it was a joint

17 effort by the Handys and everyone else to get you into a safe

18 environment, correct?

19 A.   Correct.

20 Q.   Because at this point, you still didn't -- weren't going

21 home, right?

22 A.   No.  I wasn't.

23 Q.   Okay.

24        So, after you left the Salvation Army, the first time

25 and you were leaving, there was a period of time that you came

1  back or was there a period of time that you came back to

2  Matthew's house and stayed there for a little while longer?

3  A.   No.  I only stayed at the Salvation Army one time --

4  Q.   Okay.

5           I'm asking --

6  A.   -- and I stayed there.

7  Q.   -- you about when you -- I'm sorry.

8           When you went -- when you left the Salvation Army, did

9  you return to Matthew Handy's home?

10  A.   No.

11           I went home, back to New Jersey.

12  Q.   Okay.

13           Now, if I am understanding your -- your testimony, you

14  said that, Matthew -- ah -- broke up with you in February --

15  A.   Yes.

16  Q.   -- is that right?

17  A.   February 10th.

18  Q.   Do you recall when you were giving information to the

19  agents that came to the hospital to talk to you about these

20  allegations, do you recall that?

21  A.   Yes.

22  Q.   Do you recall telling them, that you were the one that had

23  broken up with Matthew and that you, sometimes, had like an on-

24  again, off-again type of relationship with him?

25  A.   No.

Zire Hannah - Cross

1    Q.    You never told the agents that?

2    A.    No.

3    Q.    Do you -- and -- and my understanding in response to the

4    Government's question about, Matthew told you he was in a gang,

5    what gang did he tell you he was in?

6    A.    He told me, he was a crick --

7    Q.    A crick?

8    A.    -- that's all he told me.

9    Q.    Okay.

10         You never saw -- and you said, that he said, he had

11   guns, am I correct in that?

12   A.    Yes.

13   Q.    Did you ever see a gun?

14   A.    No.

15   Q.    And you were saying, that you said that his brother had

16   guns, right?

17   A.    He said that his brothers -- never seen no guns -- I never

18   even seen his brothers.  He said, that his dad has guns, never

19   even seen his dad with a gun, nothing.  Never seen anything.

20   Q.    Okay.

21         And would it surprise you to know that Matthew didn't

22   have any brothers?

23   A.    It wouldn't surprise me.

24   Q.    Okay.

25         So, when you left and returned home, where did you go

Zire Hannah - Cross

70

1   in New Jersey?

2   A.   I went to my mother's.

3         MS. EVE:  Objection.

4         THE COURT:  State your ground.

5

6         MS. EVE:  Your Honor, this is -- this is outside the

7   scope of the direct and it's --

8         THE COURT:  Yes, where are we --

9         MS. EVE:  -- where she lived --

10        THE COURT:  -- going with this?

11        MS. GAUGHAN:  It's not --

12        MS. EVE:  -- isn't relevant.

13        MS. GAUGHAN:  -- your Honor, that's not outside the

14   scope, she actually elicit --

15        THE COURT:  Where are we going, what -- what --

16        MS. GAUGHAN:  I'm just asking her about her -- the

17   schooling, when she returned and where -- and I won't go further

18   into it.

19        But she was, basically, saying she was not going to

20   school, because of this incident.

21        THE COURT:  Okay, go ahead, I'll permit.

22   BY MS. GAUGHAN:

23   Q.   So, Ms. Hannah, I'm just -- I'm almost done, I am just

24   going to ask you a couple more questions.

25        But when you did go back home, did you go back to the

Zire Hannah - Cross                                                71

1   same house -- home that you were living in before you left a

2   year prior?

3   A.   Yes.

4   Q.   And at this point, you're -- what grade are you in the high

5   school?

6   A.   I was a senior.

7   Q.   Did you graduate?

8   A.   No.

9              MS. GAUGHAN:  Thank you, Ms. Hannah --

10             THE COURT:  Okay.

11             MS. GAUGHAN:  -- I have no further questions.

12             THE COURT:  You don't have any redirect?

13             MS. EVE:  No, your Honor.

14             THE COURT:  Okay.

15             Thank you for your testimony, you're excused.

16             (Witness excused at 10:56 a.m.)

17             THE COURT: Anything else?

18             MS. EVE:  Yes, your Honor, I'd like to present the --

19   the testimony of George Auge.

20             THE COURT:  Okay.

21             ESR OPERATOR: Please raise your right hand.

22             GEORGE AUGE, GOVERNMENT WITNESS, SWORN.

23             THE WITNESS:  Yes.

24             ESR OPERATOR: Please state your full name and spell

25   your last name for the record.

1    THE WITNESS: Detective 1, George Auge, A-u-g-e, Badge

2  No. 6488, New Jersey State Police.

3                    DIRECT EXAMINATION

4  BY MS. EVE:

5  Q.   Officer, how long have you been with the New Jersey State

6  Police?

7  A.   I've been with the State Police for thirteen years.

8  Q.   And you're currently with them?

9  A.   Yes, ma'am.

10  Q.   All right.

11          And your title is what?

12  A.   I'm a Detective 1 with the Criminal Investigation office.

13  Q.   Okay.

14          I called you, Officer, I apologize, Detective.

15  A.   That's not a problem, ma'am.

16  Q.   Detective, are you familiar with Zire Hannah?

17  A.   I am.

18  Q.   And how did you become familiar with Zire Hannah?

19  A.   Ah, our office got a Crime Stoppers tip, that she was going

20  to -- her and her brother -- were going to shoot up the school

21  and blow up the school, the middle school, which is part of our

22  jurisdiction.  They don't have local police in that area, the

23  State Police patrol that.

24          So, it's part of our area, so, we were detailed out

25  there.

George Auge - Direct

1  Q.   And the school that you're referring to, is that the Buena

2  Vista Middle School?

3  A.   The Buena Vista Middle School, ma'am, yes.

4  Q.   And were you part of the law-enforcement team that

5  responded to a threat?

6  A.   I was.

7       I -- I'm more on the investigative side as opposed to

8  the operations side, but I did respond.

9  Q.   And what -- what role did you play in terms of that

10 response?

11 A.   I just coordinated the evacuation of the school, getting

12 the canines, 'cause it's -- it's a big school, you can't do it

13 with one canine.

14       Getting the canines to respond and making sure, the

15 kids are safe, the faculty is safe.  And they were moved to the

16 school -- the high school -- which is, approximately, five

17 hundred yards from the middle school through parking lots, so

18 you could just walk through the parking lots and they were moved

19 to the gymnasium of the high school.

20       Once we identified Zire's little brother, he was

21 escort -- he was transported back to our station.  At that

22 point, I went back to the station to conduct an interview with

23 him.  However, he's a juvenile and he's being accused of -- of a

24 crime, so he -- we needed to wait for his mother to arrive.

25 Q.   Did you question Ms. Hannah's brother once his mother

1  arrived?

2  A.   Once his mother arrived, she was pretty upset, she said,

3  this is an ongoing problem and nothing has been done about it.

4  I spoke to her in the lobby for a while beforehand.

5          I had no knowledge of -- of an ongoing problem with

6  the family.  But she explained the situation as being an ongoing

7  problem.

8          I asked her to explain it to me and she said, you'll

9  have to get that from Zire, I'm not going to give you that

10  information.  But she did allow me to interview her son in her

11  presence.

12  Q.   And did you interview Ms. Hannah?

13  A.   Ms. Hannah?

14  Q.   Yes.

15  A.   I -- yes, I interviewed Ms. Hannah at the hospital.

16  Q.   All right.

17          And how many times did you go and interview Ms. Hannah

18  in response to threats?

19  A.   In response to threats, ah, throughout the whole entire

20  investigation, I would --

21  Q.   Yes.

22  A.   -- I think it, was approximately, three times, ma'am.

23  Q.   All right.

24          And as a -- during the -- during the investigation,

25  did you have an opportunity to speak to Mr. Handy?

George Auge - Direct                                    75

1   A.    I never spoke to -- correction, I did -- I did speak to Mr.

2   Handy with -- ah -- Agent Lasco.

3   Q.    Kirk Lasco?

4   A.    Yes.

5   Q.    All right.

6   A.    He conducted the interview, ma'am, I was just -- it was out

7   of state, it was in Pennsylvania, he -- he did everything, I

8   just was sort of standing by.

9   Q.    All right.

10         And when you were present with FBI Agent -- Special

11  Agent Lasco, interviewing Mr. Handy did he admit that he had

12  made the threats?

13  A.    Yes.

14         MS. EVE:  Nothing further, your Honor.

15         THE COURT:  Okay.  Any questions?

16         MS. GAUGHAN:  No, your Honor, thank you.

17         THE COURT:  Thank you very much for your testimony,

18  you're excused.

19         THE WITNESS:  Thank you, your Honor.

20         (Witness excused at 11:01 a.m.)

21         THE COURT:  Okay.

22         Any further evidence by either, the Government or the

23  defense?

24         MS. EVE:  Nothing from the Government, your Honor.

25         THE COURT:  Defense?

1          MS. GAUGHAN:  Your Honor, based on the evidence that

2    the Government produced, I would not be calling any live

3    witnesses.

4          THE COURT:  All right.  Very well.

5          MS. GAUGHAN:  Thank you.

6          THE COURT:  Briefly, what I intend to do is, hear

7    argument, give the Government an opportunity to respond to your

8    argument and then, your client can address the Court, if he

9    wishes.

10         MS. GAUGHAN:  Very well, your Honor.

11         THE COURT:  All right.

12         MS. GAUGHAN:  May I begin?

13         THE COURT:  Yes, you may.

14         MS. GAUGHAN:  Thank you.

15         Your Honor, as this Court has noted on a number of

16   occasions, this is a very troubling case to say the least.

17         I know through the conversations with my client, who I

18   have been representing for some period of time now, that he's

19   had a lot of time to think about everything that he's done and

20   that, he knows how badly he's hurt Ms. Hannah and her family and

21   he's very remorseful about it.

22         Your Honor, I set out in my sentencing memo in an

23   attempt to try and explain, what is really the unexplainable.

24         I submitted Mr. Handy for an evaluation by Dr.

25   Rushing, who is a very renown psychiatrist.  She works -- she

1  actually specializes in a lot of areas, but one of the areas she

2  specializes in is the adolescent brain development.

3          She has been active in representing -- or evaluating,

4  excuse me -- a number of the juvenile individuals, who were

5  sentenced to life without the possibility of parole and in light

6  of the Supreme Court's decision, many of those juveniles have --

7  are not being considered for -- for release prior to -- you know

8  -- spending the rest of their life in -- in custody.

9          And I'd bring that to the Court's attention, Judge,

10  because I think that even the Supreme Court of the United States

11  has recognized that adolescent brain development occurs over a

12  period of time and this is a scientifically and medically proven

13  fact, that the adolescent brain does not fully develop until the

14  mid-twenties.

15          THE COURT:  Yeah, I -- I --

16          MS. GAUGHAN:  I do not say --

17          THE COURT:   -- I appreciate that --

18          MS. GAUGHAN:  Yeah and I'm --

19          THE COURT:   -- and I read -- I read the report with

20  great care, primarily, because this doctor is -- is very a

21  renown doctor, very qualified, has -- has impressive credentials

22  and -- and she performed a three-hour evaluation and some

23  testing.  The testing doesn't -- doesn't indicate any mental-

24  health issues.

25          MS. EVE:  No, mental-health issues, Judge.

1       THE COURT:  She does tell me a little bit about, you

2  know, how people develop.  He was a young man, but he was still

3  an adult, he was twenty-one.

4       MS. GAUGHAN:  Hm-hmm.

5       THE COURT:  And tells me, that some of it is his

6  inability to have coping skills, but as you well know, one of

7  the problems that I have with this case -- a serious problem --

8  is that this happened over a significant period of time, three

9  weeks.

10       MS. GAUGHAN:  Hm-hmm.

11       THE COURT:  And as I've said before, he intentionally

12  and volitionally engaged in a -- literally, a campaign where he

13  first reported to the local police, charging her with some

14  pretty serious crime --

15       MS. GAUGHAN:  Hm-hmm.

16       THE COURT:  -- defaming her character, charging her

17  with some crimes.

18       And then, as if that was not enough, reported to the

19  New Jersey Office of Homeland Security and Preparedness, the

20  federal authorities --

21       MS. GAUGHAN:  Hm-hmm.

22       THE COURT:  -- took it, one notch over and if that was

23  not enough, took it to the -- the Department of Homeland

24  Security in Philadelphia and as if that was not enough,

25  continued on the campaign with Crime Stoppers --

1        MS. GAUGHAN:  Hm-hmm.

2        THE COURT:  -- and the like.

3        MS. GAUGHAN:  Right.

4        THE COURT:  So, you know, pretty intentional conduct,

5    misguides as it may have been --

6        MS. GAUGHAN:  Hm-hmm.

7        THE COURT:  -- planning --

8        MS. GAUGHAN:  Hm-hmm.

9        THE COURT:  -- over an extended period of time.

10       It doesn't seem to me, this is a -- you know --

11   somebody who on the spur of the moment, without regard to the

12   consequences, did something, like, a juvenile would do.

13       MS. GAUGHAN:  Well, Judge, I -- I understand the

14   Court's concern and -- and I -- I hear what you're saying and I

15   -- I guess, the only thing that I would -- would state, which is

16   contained in Dr. Rushing's report, is that each individual

17   develops at a different time.  And yes, it did occur over a

18   three-week period.

19       THE COURT:  We don't know how -- we don't know --

20   there's no study indicating to me at what stage of development

21   he was --

22       MS. GAUGHAN:  Right.

23       And I don't think that --

24       THE COURT:  -- so --

25       MS. GAUGHAN:  -- there exists such a --

1    THE COURT:  -- so, it's just generalities --

2    MS. GAUGHAN:  Yes, no, it -- absolutely.

3    THE COURT:  -- and that's what I am trying to suggest,

4  it's a generalization that -- you know -- people, who are not

5  fully developed -- but he was twenty-one years of age --

6    MS. GAUGHAN:  He was, Judge.

7    And I guess, I was just trying --

8    THE COURT:  -- ah --

9    MS. GAUGHAN:  -- to provide a little bit of the

10  history, but I -- I will move on --

11    THE COURT: Yes.

12    MS. GAUGHAN:  -- I do --

13    THE COURT:  But I guess, I want to talk to you a

14  little bit about it --

15    MS. GAUGHAN:  Sure.

16    THE COURT:  -- because you raised that as a basis for

17  a downward departure or a downward --

18    MS. GAUGHAN:  A downward variance, your Honor --

19    THE COURT:  -- variance.

20    MS. GAUGHAN:  -- yes, I did.

21    THE COURT:  A downward variance and you will agree

22  with me, that I think, that the study and the information she

23  gives me, while useful it doesn't necessarily tell me, you know,

24  what the stage of development was and so, I don't know --

25    MS. GAUGHAN:  Hm-hmm.

1      THE COURT:  -- that's just speculation.

2      And this case is a little bit distinguishable in that

3  it's not just one act.

4      MS. GAUGHAN:  Correct, I --

5      THE COURT:  -- it's multiple acts, I --

6      MS. GAUGHAN:  Hm-hmm.

7      THE COURT:  -- you know with a lot of level of

8  sophistication --

9      MS. GAUGHAN:  Well, Judge, I --

10      THE COURT:  -- and planning.

11      MS. GAUGHAN:  -- I -- I agree, I agree --

12      THE COURT:  Right.

13      MS. GAUGHAN:  -- this isn't an isolated incident.

14      But I do think that -- that -- and again, I don't know

15  that there is -- exists and study -- that she can say, that this

16  was his brain development at this time, obviously, since it's

17  four years later, that she is actually evaluating Mr. Handy

18  regarding these events.

19      Part of the reason that I did have her -- him --

20  evaluated is just because of how different -- ah -- I mean, it's

21  out of the clear blue.  I mean, this is a -- this is a young man

22  that has no record, that -- I would submit to the Court -- he's

23  involved in any gangs, there is no evidence that he is, I don't

24  know what was said to Ms. Hannah, if that was said.

25      But clearly, he is -- is a young man, who has been

1   raised by both of his mother and father.  He attended high

2   school, he graduated from high school.  He was very much to

3   himself as I indicated in my report.

4          THE COURT:  Right.

5          MS. GAUGHAN:  And, perhaps, that's part of the reason

6   why, they were able to live in that -- in that home, in that

7   bedroom for a four-month period of time without the parents

8   knowing, because Matthew would, basically, go to school, come

9   home and be in his room, whether that's healthy or not, it's not

10  a debate.

11         But I mean, that could possibly be the explanation as

12  to why they were able to secrete her in there without their

13  knowledge for that period of time.

14         I would -- I would ask the Court to consider the

15  length of time from this -- that this event occurred, I mean,

16  this is an event that occurred four years ago.  The Court can

17  certainly take into account, post-offense rehabilitation.

18         I believe Mr. Handy has been steadily employed since

19  this incident, he continues to work at the Home Depot, he's been

20  there, approximately, two and a half years, it's not a full-time

21  position, he has -- he had interviewed for a full-time position

22  through the company at various times.  But works between -- just

23  not a full-time position -- but more than the typical part-time.

24         So, I -- I think one of the things that --

25         THE COURT: You -- you will agree with me, while I --

1   under <u>Pepper</u> -- I could consider his post-conviction conduct in

2   terms of rehabilitation, that does not automatically entitle him

3   to a downward variance?

4        MS. GAUGHAN:  No, that's -- no, I mean, clearly,

5   Judge, it -- it's a series of events, it's a series of factors

6   that the Court takes into consideration under 3553(a) and the

7   factors that I've pointed out to the Court, whether or not you

8   determine based on the totality of the circumstances under the

9   statutory provisions, that a variance is appropriate in this

10   case.

11        And what I am saying to the Court is that while this

12   was a three-week period of time, I would submit to the Court, it

13   was an aberration, it was -- this is a -- this was a situation

14   where he had his first serious girlfriend, yes, it was a dys --

15   we know it was a dysfunctional relationship from even just from

16   -- from Mr. Hannah, from how it started, that much is clear.

17        People don't live in a home secretly, they don't get

18   involve in relationships like that, so -- so there was, clearly,

19   dysfunctional aspects of their relationship.

20        Obviously, what Ms. Handy did was wrong, he pled

21   guilty to that, he's before this Court on that conduct.  But to

22   just look at this in isolation without considering other things

23   in his life, I don't think would satisfy the elements under

24   3553(a).  So, I am asking the Court to consider his personal

25   history and characteristics.

1          I am asking the Court -- well, it's not only a basis

2   under Pepper for a variance, the Court clearly can -- can look

3   at his -- his conduct from the period of this event in 2014 to

4   where we are now in 2018, ah --

5          THE COURT:  So -- so, I could consider it and -- and I

6   will consider his post-rehabilitation conduct, because it is --

7   it is helpful, I agree with you, he -- he's shown that he could

8   be redeemed.

9          But the conduct in -- the particular conduct in this

10  case, it's pretty egregious, not only -- not only did -- did he

11  focus on her and put her in jeopardy and created a crisis for --

12  for this young woman, who has issues, but he implicated other

13  people as well, indirectly or directly, he implicated her --

14         MS. GAUGHAN:  Hm-hmm --

15         THE COURT:  -- brother --

16         MS. GAUGHAN:  -- hm-hmm.

17         THE COURT:  -- who had to be pulled out of school and

18  go through an interview as scared as he may be, a kid that had

19  never been in trouble with the law as far as I know, from the

20  record.

21         MS. GAUGHAN:  Hm-hmm.

22         THE COURT:  And she's being interviewed while in the

23  hospital for a surgery by the police multiple, multiple times.

24         To top it off -- I mean, it doesn't take much of a

25  rocket scientist to -- to know or think that -- that kind of

1   report to the authorities is going to call upon, you know, the

2   school shutdown, we see it in the news all of the time.

3          MS. GAUGHAN:  Hm-hmm.

4          THE COURT:  And as it happened here, the school had to

5   be shutdown to determine whether there was a -- a real threat or

6   not.

7          And you know, these are pretty serious areas where he

8   concentrated on focusing and -- and -- so, it's extraordinarily

9   egregious, I mean that one --

10         MS. GAUGHAN:  Well --

11         THE COURT:  -- to me, maybe, the guidelines that I

12  have are not enough.

13         MS. GAUGHAN:  -- well, Judge, the -- I think the

14  guidelines take into account the -- the incident at the school.

15  I mean, he did receive a four-level enhancement under the

16  guidelines, because of the fact that the school was evacuated,

17  because of the circumstances in which that all took place.

18         So, the guidelines, itself, take that conduct into

19  account, that the Court is -- is illustrating.

20         And I'm not here to say what happened here was not

21  egregious, it -- it was.  I am just asking the Court to take it

22  into consideration in the mind of where Mr. Handy was at that

23  point in his life, not to justify it, there is no justification

24  for what occurred here.

25         But -- but it's so unexplainable, given his

1    circumstances, given his lack of any record, given the fact that

2    he's a high-school graduate, given all of that, that there was

3    something more that was going on.

4            And I would just -- I would just stress to the Court,

5    that while I don't have a definitive test from Dr. Rushing that

6    he was at some level where his -- his decision-making was

7    affected or it could be by that -- the front lobe, which is the

8    last, you know, area of the brain to develop.  Clearly, he was

9    engaging in risky behavior.

10           And again, it's not to justify it, but I think it's a

11   consideration that the Court should -- could and should -- take

12   into account in determining a fair and just sentence in this

13   case.

14           THE COURT:  Well, I appreciate that, Attorney Gaughan.

15   It's -- it's troubling and you are aware that nowadays, on the

16   news, we read many, many times, that people who have never been

17   in trouble with the law, have engaged in monstrous crimes,

18   that's not unusual in today's -- especially, with the access of

19   technology and all of that, it's so easily available to somebody

20   like Mr. Handy.

21           So, I mean, I -- it's pretty troubling and you know,

22   the sophistication of this crime and the complaints and -- and

23   the insistence on -- you know -- drugs, guns, child molestation,

24   terrorism, it's just -- it's just troubling to see.

25           MS. GAUGHAN:  Well, Judge, I think that just shows the

1    level of desperation he was at in -- in getting some kind of

2    reaction and again, it doesn't --

3          THE COURT:  But he's not mentally ill, there is no

4    indication on this record that, he -- number one -- suffers from

5    a mental illness.

6          Number two, by all accounts, he -- he -- his parents

7    have given him a pretty decent upbringing.  I mean, these are --

8    it seems to me -- hard-working people, who provide for him and

9    have provided for him.

10          I do agree with you that, he's sort of a loner and

11    isolated from -- from -- you know -- having a social life --

12          MS. GAUGHAN:  Hm-hmm.

13          THE COURT:  -- but it makes it even more difficult and

14    I --

15          MS. GAUGHAN:  Well, Judge, I -- I think under all the

16    circumstances and again, the Court is going to put the emphasis,

17    that you feel is appropriate in this case, but I would submit to

18    the Court, that again, you know, in looking at not just in

19    isolation of this one incident, but in taking into account, Mr.

20    Handy's entire life that he's lived up to this point, while

21    three weeks, you know, as you stated it's a number of occasions

22    within that three-week period of time.

23          But then after that stopped, there was no further

24    negative conduct on his part at all.  This matter was not

25    indicted, I believe, until 2016.

1      So, Mr. Handy -- while he bears the responsibility of

2  his conduct in this case, that goes without question -- I'd just

3  ask the Court under all of the circumstances to consider his

4  post-offense conduct along with the other issues involved in

5  this case.

6      And I would submit even -- even understanding the

7  level of his conduct, I would ask the Court under all of the

8  circumstances to consider a sentence at, either, the bottom end

9  of the guideline range, which I believe is what the Probation

10  officer's recommendation is.

11      I still would urge the Court to -- to consider going

12  below the guidelines, but I would certainly ask the Court to --

13  based on all of the evidence in this case.  And, obviously, the

14  Probation officer had a lot of opportunity to meet with my

15  client, meet his parents and go out to the home, so obviously,

16  their recommendation holds a great weight as well.

17      So, for all of the reasons, your Honor, I would ask

18  the Court to consider a sentence below the applicable guideline

19  range.

20      THE COURT:  Thank you very much, Attorney Gaughan.

21      And I really appreciated your sentencing memo, I

22  thought it was very helpful and excellent, it's not unusual for

23  you to submit documents as the one you've submitted and I've

24  read it very carefully, including the letters of recommendation

25  from his family and friends and I've read very carefully Dr.

1   Rushing's report.

2          So, I -- I appreciated your submission on behalf of

3   your client.

4          MS. GAUGHAN:  Thank you, your Honor.

5          THE COURT:  Attorney -- Attorney Eve.

6          MS. EVE: Your Honor, there is an invited response to

7   one of the representations from counsel, so I wanted to bring

8   that up, before I get into my arguments here.

9          Counsel brought up the fact, that this matter was not

10  indicted until 2016.  What counsel doesn't tell you is, that the

11  Government for more than a year and a half, was in contact with

12  the defense trying to work out an information rather than an

13  indictment against the defendant.  The delay was not for any

14  reason, other than an attempt to try to come to some resolution

15  with regard to the charges.

16         I don't want to minimize at all, the defendant's

17  conduct, it's reprehensible, it's inexcusable, it's selfish.

18         I, too, read the expert's report and all I could do

19  was shake my head.  I have a twenty-four-year old, a twenty-two-

20  year old and a nineteen-year-old son.  I don't need a

21  psychiatrist to tell me something about the adolescent mind,

22  I've lived with it, have lived with it, continue to live with

23  it.

24         But I have trouble justifying the actions of the

25  defendant, given my knowledge of the adolescent mind.  What we

1   have here is a man, who decided, yeah, our relationship ended

2   and I'm gonna do whatever I want to, I'm gonna mess with her.

3   My former girlfriend, who I know suffers from mental illness,

4   who is emotionally and mentally vulnerable, I'm gonna exploit

5   that.  I'm gonna make accusations that she's sexually abusing

6   her nieces, that she's photographing them and distributing the

7   pictures.

8        I'm going to say that, she's going to bomb the

9   Salvation Army in Chester, Pennsylvania, where she used to live.

10   I'm going to say that she's gonna blow up the Chester Police

11   Department.  I'm gonna say, that she's -- she has a brother, who

12   is a Muslim extremist.

13        In this day and age, making such an accusation, it's

14   not going to just go by the wayside, it's going to be acted upon

15   by law-enforcement officers, who were tabbed the responsibility

16   of protecting the citizenry and the population in schools, in

17   malls, at the Salvation Army, at the -- at Chester's own Police

18   Department.

19        And he can sit at his home, hide behind -- hide

20   anonymously and just send out these tips, that points the finger

21   at this poor victim, knowing full well by giving her name,

22   giving details about her, that she's the one, who law

23   enforcement is going to go find.  She's the one who law

24   enforcement is going to interrogate.  And nothing is supposed to

25   happen to him.

1    But when it does happen to him, when he does get

2 charged, oh, I've never committed a crime before.   And, you

3 know, I -- I -- I treat my family members well and you know,

4 poor me.

5    Well, what about the other people, what about this

6 criminal conduct, what about the effect that it had on this poor

7 woman, her mom, her brother, the kids at the middle school.

8    And let's not think for a minute that after her

9 brother is targeted at the middle school, pulled out by law-

10 enforcement officers, that his classmates didn't see that, his

11 classmates didn't bully him afterwards.   Kids are rough on each

12 other for no reason and he gave them a reason to bully her

13 brother.

14    Your Honor, in this case, the Government aggressively

15 sought whatever enhancements and a basis for upward departure

16 that we possibly could, because the defendant's actions are so

17 egregious.   And yes, the Government has identified them as acts

18 of terror, it's domestic terrorism, because arguably, that's

19 exactly what they were.

20    He terrorized this young woman, her family, these

21 kids, the populations that exists in the school and caused these

22 law-enforcement officers to act based on nothing more than his

23 own words or his -- his -- the keys that he stroke -- struck on

24 a laptop or on a phone or a tablet.

25    As the Court has acknowledged, this was a campaign

1    that lasted over the course of three weeks, not an isolated

2    incident, not -- who knows whether this is aberrant behavior?

3        Just how the defense is looking for every excuse, what

4    the Government submits to the Court is we have facts, we have --

5    we have circumstances that disrupted people for no reason, other

6    than the defendant's own desire to exploit and cause havoc.

7        The Government asks the Court -- said to the Court --

8    to impose a sentence that clearly represents the significance of

9    the crimes that this defendant committed.   Thank you.

10       THE COURT:  Very well.  Thank you very much.

11       Does your client wishes to address the Court?

12       MS. GAUGHAN:  Yes, your Honor.

13       THE COURT:  You could bring him forward, Attorney

14   Gaughan.

15       (Pause at 11:23 a.m.)

16       MS. GAUGHAN: Mr. Handy, this is your opportunity to

17   speak to the Judge.

18       THE DEFENDANT:  Ah, all right.

19       I would like to -- ah -- apologize to my family -- her

20   family for -- and to the -- well, all the agencies and the

21   children at the school for the disruption I -- ah -- created.

22       I was upset, I was hurt, I wasn't thinking straight

23   and I accept full responsibility for what I've done.

24       Since then, I have changed, this whole situation gave

25   me a lot of time to think and then, right now, I make better

1  decisions, 'cause this ain't something I'd want to go through, I

2  not even -- I'm not no criminal or type of person that gets into

3  trouble, so I ain't gonna -- I don't ever want to have to be in

4  this position like this again or put my family in a position or

5  innocent people in the position, where they don't have -- and

6  those kids should have never been evacuated.

7          Zire should have never went through what she went, but

8  because of my -- ah -- selfish innocence -- hurt -- I acted up.

9  And I apologize to everybody for that.

10          You know, it's stressful on my parents, my sisters,

11  ah, waking up and having to come up here and meeting with

12  lawyers and pretrial and all of that.

13          And it makes me think, like, if I would have never did

14  that, where would I be right now?  I probably would have had a

15  better job, out of the house.

16          So, ah, this is gonna make my life a whole lot harder,

17  but it's something that, I made my bed, so gotta lay in it and

18  this is -- ah, something that I'm terribly sorry for, it's a

19  stupid thing for me to do.

20          I wish I just -- ah -- I should have talked to my mom,

21  my parents and my sisters about the breakup rather than reacting

22  on my own, 'cause I just sat in my room and just had my thoughts

23  to myself, which caused me to react in a way, that I shouldn't

24  have reacted.

25          But like I said, I'm sorry that -- that I hurt her

1   family and all the agencies and my family for causing all of

2   this trouble.

3           THE COURT:  You -- you say, it's a stupid thing to do,

4   this is beyond stupid, isn't it?

5           THE DEFENDANT:  Oh yeah, this is -- it's --

6           THE COURT:  It's outrageous and cruel.

7           THE DEFENDANT:  -- yeah, incredibly.

8           There's so many things, it's mean, it's stupid, it's

9   evil, it's selfish, there's a whole list of things that -- that

10  it is, there ain't nothing good came out of it.

11          But ah -- just -- I just -- I wasn't thinking at all,

12  I was just heartbroken and reacted off of emotions.

13          THE COURT:  How could you not be thinking, it was --

14  how could you not be thinking of the consequences of your

15  action, there are consequences and you saw them --

16          THE DEFENDANT:  The --

17          THE COURT:  -- but there is another consequence, which

18  is that you ultimately, have to face me.

19          THE DEFENDANT:  And that -- that was, actually --

20          THE COURT:  -- and the fact that you're looking at

21  significant jail time.

22          THE DEFENDANT:  Yes, and looking at you, wasn't even

23  on my mind at the time, it was, like, I'm getting her into

24  trouble, it was more so to annoy her, I didn't -- I knew she

25  didn't have anything, like, bombs or anything like that, so I

1    knew she wouldn't go to jail.  But it would annoy her to like

2    say, hey, I'm still here.

3          But my -- my thinking didn't go as far as, oh, this is

4    false and they're gonna come back and get you or they could

5    track you by your IP address, like --

6          THE COURT:  You know the difference between the truth

7    and a lie, right?

8          THE DEFENDANT:  Yes.  And when I --

9          THE COURT:  You didn't think that was going to be

10   lying to the authorities about what a person is doing or not

11   doing, isn't -- you didn't think that was a crime?

12         THE DEFENDANT:  I didn't even think at all, like, I

13   was so hurt, my mind was in a blur, I didn't think, oh, this is

14   gonna get me into trouble or I need a Plan B, if it backfires, I

15   wasn't -- I didn't think nothing through, just like -- ah --

16   bringing her out there, I didn't think none of that stuff

17   through, it was --

18         THE COURT:  Well, you're going to have a lot of time

19   to think about this --

20         THE DEFENDANT:  Yes.

21         THE COURT:  -- you know it?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Anything else, you'd want me to consider?

24         THE DEFENDANT:  Ah, the fact that I've changed since

25   then and all I have is just work and come home and I accept what

96

1    I've done and you know -- and I'm sorry to everybody.

2            THE COURT:  Okay, thank you.

3        MS. GAUGHAN:  Thank you, your Honor.

4            THE COURT:  I want to take a few minutes and think

5    about the sentence and the arguments.

6            I know, I have a matter scheduled, Pat, are the

7    lawyers outside?

8            ESR OPERATOR:  I'll see if I can check on them.

9            THE COURT:  Could you check and tell them, it's

10   probably going to be a little later, once -- you know -- 12:30

11   or so.

12           ESR OPERATOR:  Okay.

13           THE COURT:  We'll take fifteen minutes.

14           ESR OPERATOR:  All rise.

15           (A recess is held at 11:28 a.m.)

16           (Resumed in open court at 11:47 a.m.)

17           THE COURT:  Attorney Toplin, are you here for the

18   trial, the bench trial?

19           MS. TOPLIN:  I am.

20           THE COURT:  I'm a little bit behind.

21           MS. TOPLIN:  I heard.

22           THE COURT:  I was trying to move it to 1:30, would --

23   if we'd start at 1:30 will that be too tough for you guys?

24           MS. TOPLIN:  I think that's fine, your Honor, yes.

25           THE COURT:  Would you let --

1          MS. TOPLIN:  Sure.

2          THE COURT:  -- I think it's Attorney McOwen (ph) --

3          MS. TOPLIN:  McOwen, I'll let her know.

4          THE COURT:  -- know that we're going to start at 1:30,

5    if that's okay.  And Attorney Rotella, I think.

6          So, Counsel, is the Government and the defense ready

7    for the Court to pronounce sentence in this case?

8          MS. EVE:  Yes, your Honor.

9          MR. GAUGHAN:  Yes, your Honor.

10         THE COURT:  Very well.

11         First of all, let me just take this opportunity to

12   thank you for your arguments and your presentations.  I think

13   this was a pretty interesting case from the standpoint of the

14   objections that both the Government and the defense have made in

15   challenging to -- to say the least.  So, I appreciate your

16   arguments and your submissions.

17         And I want to assure you that I very carefully, not

18   only the presentence investigation report, but I very carefully

19   read the defendant's sentencing memorandum and I commend you for

20   giving me a sentencing memorandum, that was extremely helpful

21   and to the point, I really appreciate that.

22         I've read the letters from the defendant's mother,

23   from the defendant's brother, older sis -- I mean from the

24   defendant's older sister, Deborah Stewart (ph) and I read the

25   letter from Deana Handy.

1    So, I think there was a letter from a teacher as well,

2  Susan Mc --

3    MR. GAUGHAN:  That's correct, there's two letters,

4  your Honor, one from a community member and one from a teacher.

5    THE COURT:  -- and one from a teacher, so I've read

6  those letters, giving me a little bit of a sense of -- of who

7  Mr. Handy is and has been.

8    And I've carefully read the -- the in-person

9  curriculum resume of Dr. Susan E. Rushing's impeccable

10  credentials and studies and her report, which I thought it was

11  most useful in this -- in this case, explaining to me a little

12  bit about the development of -- of young teenagers in terms of

13  their brain development.

14    And talking to me a little bit about adolescence

15  immaturity, responsibility and telling me a little bit about the

16  fact that his post-rehabilitation conduct, at least, is

17  indicative that he may be amenable to some rehabilitation as

18  evidenced by the fact that he has not done anything in the last

19  four -- four years.

20    So, I have read your submissions very carefully and I

21  thank you for them.

22    I also read the Government's memorandum carefully and

23  considered the arguments that the Government attorney has made

24  as well as the argument that defense counsel has made for a

25  sentence -- a section below the guideline range.

1    So, I'd commend you for your advocacy.  And sentencing

2  as you well know, it's not an easy task for the Court and it's

3  something that we take very seriously.

4    So, what I want to do, number one, is just place a

5  brief statement on the record, having ruled on the objections,

6  so that the record is abundantly clear and then, I want to

7  quickly move on to the 3553(a) factors that I have to consider

8  and discuss those.  And then, at the conclusion of that, tell

9  you how I intend to treat Mr. Handy in terms of a -- a sentence

10  in this case.

11    So, Ms. Toplin is here, so she'll -- okay.

12    So, could you tell him, we're going to do -- if we

13  could do it at 1:30?

14    (Pause at 11:52 a.m.)

15    THE COURT: All right.

16    Maybe we could take those -- yes, there is going to be

17  a change, Attorney Toplin, we have to take two witnesses, who

18  are here, so we'll get started and then, we'll take a break

19  immediately after this case.

20    MS. TOPLIN:  Okay.

21    THE COURT:  Just have them wait, a change of plan.

22    So with regards to the presentence investigation

23  report including the identification of the five counts, Counts 1

24  through 5, I already adopted the presentence investigation

25  report and the Probation officer's calculations in this case.

1    As you well know, the maximum statutory minimum term

2 of imprisonment for Count 1, the cyberstalking in violation of

3 Title 18, Section 2261(A)(2)(B), it's five years.  The statutory

4 maximum fine is $250,000.00, the statutory maximum terms of

5 supervised release is three years.

6    Regarding Counts 2 and 3, the interstate use of a

7 telecommunications device to willfully convey a threat, in

8 violation of Title 18, Section 844(e), again the statutory

9 maximum penalty for that offense is ten years, the statutory

10 maximum fine is $250,000.00 and the statutory maximum of

11 supervised release is three years.

12    And for Count 4 and Count 5, the statutory maximum --

13 for false statements -- Count 4, false statements and involving

14 domestic terrorism in violation of Title 18, Section 1001, the

15 statutory maximum term of imprisonment for this offense is eight

16 years, the statutory maximum fine is $250,000.00 and the

17 statutory maximum term of supervised release is three years.

18    For Count 5, the maximum statutory, it's a little bit

19 different, false statements in violation of Title 18, Section

20 2001(a), statutory maximum term is five years, not eight, as to

21 Count 4, it's eight years and the statutory maximum fine is

22 $250,000.00 and the statutory maximum term of supervised release

23 is three years.

24    Having overruled the defense objections to the

25 victim's vulnerability and the Government's objections in this

1   case as well as the Government's request for an upward departure

2   under the guidelines, Note 4, I will calculate the guidelines as

3   follows:

4          The guidelines set the base offense level at eighteen,

5   under the Sentencing Guidelines 2A6.2, I added two levels under

6   the Sentencing Guidelines 2A6.2B1E, because Mr. Handy engaged in

7   a pattern of activity involving stalking, threatening, harassing

8   or assaulting the same victim.

9          Two levels were added under the Sentencing Guidelines

10  3A1.1B1 because he knew or should have known, the victim of the

11  offense was a vulnerable victim due to her mental-health issues

12  and two levels were added for an adjustment for obstruction of

13  justice under the Guidelines 2J1.1, Note 3 and 3C.1 Note 8.

14         Two levels were subtracted under the Sentencing

15  Guidelines 3E1.1A, because he accepted responsibility and pled

16  guilty to the offense and an additional level was subtracted,

17  because he has assisted the authorities in the investigation of

18  -- by timely notifying the authorities of his intention to plead

19  guilty.

20         So, the result is a base offense level of twenty-one

21  and a base offense level of twenty-one, he is assessed a zero

22  history point for a criminal history of category of I.

23         And so, with a base offense level of twenty-one and a

24  criminal history I, the guidelines range is thirty-seven to

25  forty-six months.

1          So, with that I will then consider, the 3553(a)

2   factors in this case to determine what would be a sufficient and

3   not greater than necessary to accomplish the goals of sentencing

4   to reflect the sentence that would reflect the seriousness of

5   the offense, deter criminal conduct by him or others, protect

6   the community as well as provide him an opportunity for

7   rehabilitation.

8          I have to -- and I have considered -- the nature and

9   circumstances of this crime.  I have considered his history and

10  characteristics as the presentence report points out, this is

11  his first criminal offense of any kind.

12         I need to consider the other sentencing factors, such

13  as, a sentence to reflect the seriousness of the offense,

14  promote respect for the law and provide an opportunity for

15  rehabilitation and punishment, protect the public and address

16  his rehabilitative needs.  Plus impose a sentence that will

17  avoid unwarranted sentencing disparities with people, who are

18  similarly situated.

19         So, in summary, I have considered the advisory

20  guideline range in this case, I have considered the factual

21  findings in the presentence investigation report, the

22  Government's and the defense sentencing arguments and

23  memorandums.

24         I have considered the Probation officer's

25  recommendation for a sentence at the bottom end of the guideline

1   range of thirty-seven months.

2           And I have considered the Government's recommendation

3   for a sentence in this case as well as, I have considered the

4   defendant's statements to the Court.  I think, he understands

5   the consequences today of -- of the day of reckoning with the

6   consequences of his actions back forty -- four years ago -- when

7   he was twenty-one years old.  I disagree with him, that this was

8   a stupid event, I think, this was beyond stupid.

9           So, when I take a look at and consider the nature and

10  circumstances of the crime, Mr. Handy's actions may have been

11  misguided, may have been as a result of acting out, may have

12  been as a result of being upset or hurt and may have been

13  inexplicable and -- but certainly, it is clear based on the

14  quality and the nature of the acts, that his acts were

15  intentionally calculated and persistent and involved some degree

16  of planning over a significant period of time between January of

17  2014 and February of 2014.

18          I think it is worthwhile pointing out the quality and

19  the nature of the acts that are well documented in the

20  presentence investigation report, beginning at Paragraph 6

21  through Paragraph 17, which I will incorporate by reference,

22  because as to Count 1, for example, Mr. Handy's conduct involved

23  sending an anonymous call and e-mail messages to various state

24  and federal agencies, that indicated that his girlfriend, who he

25  had been involved with over a period of time, was engaged in a

1  number of different criminal activities, including engaging in

2  child exploitation and molestation as extraordinarily cruel as

3  that may be.  Using drugs, building pipe bombs and intending to

4  use guns and explosives as acts of domestic terrorism.

5        So, if that was not enough, he proceeded to report to

6  the Buena Borough Police Department, the National Center for

7  Missing and Exploited Children, that she had been taking

8  pictures of her under-aged nieces while they were naked and was

9  distributing the pictures.  And had stated that she had sexually

10  assaulted her nieces on several occasions.

11        As to Count 1 -- Count 2 -- on January 27th, 2014 he

12  also sent anonymous e-mails to the New Jersey Office of Homeland

13  Security and Preparedness, which contained information

14  indicating that she -- his former girlfriend -- had threatened

15  to use explosive devices against the Salvation Army in Chester

16  County.

17        As the Government said, he had threatened to blow the

18  Salvation Army up as well as blow up the local police department

19  in this case and told them, that she was planning on blowing

20  them up with explosives and that she actually made some

21  explosives in front of him to -- to further add credibility to

22  the story.

23        If that was not enough, he upped the game by reporting

24  it to the federal authorities, because on January 28th, 2014, he

25  also sent an e-mail to the Philadelphia Area of the United

1  States Department of Homeland Security as documented in the

2  presentence investigation report, again, alleging that she was

3  selling drugs and explosives to other people, that she

4  threatened to use explosives at undisclosed locations and that

5  she kept explosives or stored them in Atlantic City, New Jersey

6  and that she's threatened to use explosives in an unidentified

7  mall in New Jersey.

8          He also reported to the state authorities in a

9  February 14th, 2014 anonymous tip to the New Jersey Office of

10 Homeland Security and Preparedness, that -- that he knew that

11 she had been previously investigated for terrorism, so her

12 working with fertilizer and metal pipes, saw her watching and in

13 a video in a foreign language, showing how to make a bomb and

14 that she had placed a knife to his throat to threaten him from

15 disclosing it to the authorities.

16         He also reported to the federal authorities on May 9th,

17 2014, he sent two e-mail tips to the Homeland Security, one at

18 6:28 p.m. and the other one at 6:42 p.m., as indicated in the

19 presentence investigation report, the details of which I am not

20 going to go in to, suffice it to say, that there were more

21 allegations that she -- making claims -- that she and her mother

22 had been supplying with materials with which to make explosives

23 and that she was trying to make a bomb to use, that bomb against

24 people who had done her wrong.

25         And that her brother and her mother were Muslim

1    extremists and supplying her with fertilizer and metal pipes and

2    that she was going to use these explosives against other family

3    members.

4            And again, Count 3, he reported that there was a

5    possibility that she was going to attack the Buena Vista Middle

6    -- Middle School in Buena Vista Township, New Jersey, the

7    morning of February 10th of 2014 with a pipe bomb and guns and

8    she identified her brother, a former student R.K., a thirteen-

9    year-old student at the school as one of the attackers.

10           And of course, he had to be interviewed and pulled out

11   of school as well as she had to be interviewed regarding these

12   allegations.

13           So, the nature of these activities, persistent

14   intentional activities, it's extraordinarily troubling to this

15   -- to this Court, it's not only cruel to the victim in this

16   case, but it is outrageous conduct, that I cannot ignore in --

17   in the circumstances of this case.

18           Mr. Handy waged a campaign to terrorize his former

19   girlfriend in retaliation -- according to him -- for the

20   breakup, acted out of -- out of jealousy, because he was upset

21   and hurt.

22           And waged a campaign falsely accusing and reporting to

23   state and federal authorities allegations of child molestation,

24   drugs, terrorism and the like -- and the like.

25           So, any extraordinarily serious crime, no doubt as the

1   Government and the defense acknowledge in the sentencing

2   memorandums.

3           So, I have considered the nature and circumstances of

4   the instant offense which in my view favors a significant period

5   of incarceration in this case.

6           I have no doubt that his jealousy and actions were

7   intended to punish the victim in this case, to make her feel how

8   he felt, that he was hurt and to create a crisis as he says, in

9   order for her to turn to him as she had done in the past.

10          However, in my view these criminal acts are

11  extraordinary in -- in many ways, not only the impact on the

12  victim, they're also extraordinary in that it caused the

13  extraordinary waste of valuable expenditures of the limited

14  public dollars to track down these false allegations and caused

15  an investigation.

16          As the Government points out, every time there is a

17  false accusation in which she was falsely accused of child

18  molestation and child pornography, using drugs, building bombs

19  and intending to use these guns and explosives in acts of

20  terrorism, the Government had to investigate these claims

21  whether real or not.

22          As the Government points out in one situation which is

23  extraordinarily troubling, regarding allegations the victim,

24  Z.H. and her brother were going to attack the school with bombs

25  and guns, the Government has to evacuate four hundred students,

1    had to evacuate out of the school, for approximately, one hour.

2           So, with regards to these allegations, both were

3    pulled out of the school and subjected to intensive scrutiny and

4    investigation by the FBI agents, one at the hospital and one at

5    the station.  And because he was a juvenile, his mother had to

6    be present.

7           So, even though Ms. Handy was the target of the

8    actions of Mr. Hand -- Handy -- Ms. -- Ms. Hannah -- was the

9    target, he also implicated her brother as well as her mother.

10   And his actions had other consequences far beyond the impact to

11   his former girlfriend and her brother and her mother.

12          The guidelines as the defense counsel points out, the

13   guidelines do account for that, reserving as it may -- it may

14   be, the fact that his actions had an extraordinary impact on --

15   on the public population.

16          His actions -- as misguided as they may be -- are also

17   disturbing, because there is nothing in his background and

18   family history that indicates he would commit a crime of this

19   nature and this quality, other than the fact that, you know, for

20   -- for his teenage years, he's pretty much a loner, dedicating

21   himself to being locked in his room, listening to music over --

22   and on computers.  So, he's been a law-abiding citizen for --

23   for most of his life until he committed this crime.

24          He is a high-school graduate.  For the last two and a

25   half years, when I tend to look at his history and

1  characteristics, when I take a look at that for the last two

2  years, he had been working, he has been productive.  I think

3  he's been working at Home Depot in a part-time position, which

4  is a low-level position.

5          There is no history of mental illness of any kind,

6  including Dr. Rushing's report -- an examination and tests --

7  document that there has been no serious medical -- mental

8  illness.  He does suffer from some minimal depression and

9  anxiety resulting from the present situation, but there is no

10  history or signs of any mental illness, which is consistent with

11  the presentence investigation report and also, consistent with

12  Dr. Rushing's evaluation.

13          There is no history of substance abuse.  There is some

14  documentation in the presentence investigation report indicating

15  drinking, but there is no -- no history that there was a history

16  of alcohol abuse.

17          So, I have considered Dr. Rushing's psychiatric

18  evaluation and opinions regarding the immaturity of his actions

19  as the doctor opines, that they were reflective of the fact that

20  he had not just -- he was just at the age of twenty-one and had

21  not developed as a full adult as many people -- it takes time

22  for them to fully develop, especially, young teenagers and

23  adolescents.  So, I have considered that and her explanations

24  that his frontal cortex was not fully developed.

25          While Mr. Handy's conduct may have been the result of

1   immaturity in his development, reckless, impetuous and

2   irresponsible, Dr. Rushing notes that in the last four years, he

3   has matured and demonstrated an ability to grow and develop as a

4   young adult with appropriate coping skills, which explains why

5   he engaged in this extremely serious crime, but it does not

6   justify it in any way, shape or form.

7            So, I have considered the report and I have considered

8   his post-conviction rehabilitation in this case, however, I

9   cannot and will not ignore that he committed a very serious

10  crime and that a lengthy sentence is appropriate.

11           While I have considered these factors, I don't think

12  that they warrant a variance from the recommended guideline

13  sentence.  I think that I can consider this conduct and the fact

14  that, I think, he has the opportunity towards being

15  rehabilitated as the basis of where the sentence -- within the

16  guidelines in -- in these circumstances.

17           So, I have considered the seriousness of the offense,

18  the need for me to impose a sentence that will promote respect

19  for the law, provide just punishment for this defendant's

20  actions and also, a sentence that protects the community from

21  further crimes by him or anyone else, who is even thinking about

22  engaging in similar conduct.

23           I think that the sentence that I will impose today,

24  will provide for his rehabilitation and his needs while he

25  serves a sentence as well as avoid unwarranted sentence

1   disparities.

2          In considering the sentence, I have ruled on one of

3   the objections, but I wanted the record to make it abundantly

4   clear, that even if the victim's vulnerability or susceptibility

5   did not factor in or facilitate the defendant's crimes in any

6   manner, I will still impose the sentence here today, that I

7   intend to impose under the circumstances of this case.

8          Accordingly, this Court is prepared and intends to

9   impose the following sentence:

10          This Court is prepared to impose a sentence of forty-

11   two months on each of Counts 1 through 5 to be served

12   concurrently, followed by three years of supervised release, all

13   the traditional conditions of supervised release.

14          I intend to impose a fine of $500.00 and I intend to

15   impose a $500.00 special assessment, that's the intent of the

16   Court.

17          Are there any comments from the Government?

18          MS. EVE:  No, your Honor.

19          THE COURT:  The defense?

20          MR. GAUGHAN: Your Honor, as your Honor knows pursuant

21   to the Third Circuit's decision in United States versus Lourdes

22   Mehas (ph), I'm required to renew my objection now at the

23   conclusion of your sentencing explanation.  So, for that -- for

24   purpose only -- I would object to the Court's sentencing

25   explanation on the grounds, that did not sufficiently address

1  the arguments I had made for a lower sentence on behalf of Mr.

2  Handy, that's necessary to add.

3          THE COURT:  Very well.

4          I -- I think I have sufficiently addressed the

5  argument for a variance, as I said before and I questioned

6  counsel, I have to consider his post-rehabilitation conduct but

7  it doesn't necessarily mean that it justifies a departure from

8  the guidelines, that is not automatic -- automatically.

9          I do recognize that he has been conduct-free in the

10  last four years, that just tells me, where he is in the

11  guidelines and that's why I'm giving him a middle-level

12  sentence, otherwise, I would have been giving him a -- a top of

13  the guidelines sentence, because I do believe based on my

14  consideration of the nature and circumstances of this crime --

15  that is his outrageous crime -- this is just beyond being --

16  immaturity and beyond stupidity, this is, persistent,

17  intentional conduct that he engaged in, complaining to the

18  authorities and making false allegations implicating his former

19  girlfriend, her family.

20          And having extraordinary consequences over and beyond

21  the fact that he is calling upon the authorities to investigate

22  her, but has other -- other implications, such as for example,

23  the Government spending an extraordinary amount of time

24  investigating these crimes while they are not investigating real

25  -- real -- actual crimes, he's taken away from them.

1    For all of those reasons, I believe, that I have

2    adequately considered all of the 3553(a) factors and the Court

3    is ready to pronounce sentence at this time.

4    So, I am going to ask Mr. Handy to please stand.

5    Mr. Handy, it is the judgment of this Court, that you

6    are hereby committed to the custody of the Bureau of Prisons to

7    be imprisoned for a term of forty-two months on each of Counts

8    1, charging you with cyberstalking in violation of Title 18,

9    Section 2261(A)(2)(B).

10    Counts 2 and 3, the interstate use of a

11    telecommunications device to willfully convey a threat in

12    violation of Title 18, Section 844(e).

13    And Counts 4 and 5, false statements in violation of

14    Title 18, Section 1001(a).

15    All such counts to be served concurrently to each

16    other.  And upon your release from imprisonment, you shall be

17    placed on supervised release for a term of three years.  These

18    terms consist of terms of three years on each count, all such

19    terms to run concurrently.

20    Within seventy-two hours of your release from the

21    custody of the Bureau of Prisons, you shall report in person to

22    the Probation office in the district to which you are released.

23    And while on supervised release, you shall not

24    consider another federal, state or local crime -- you shall not

25    commit another state, federal or local crime -- and you shall be

1 prohibited from possessing a firearm or other dangerous device.

2 And you shall not possess an illegal controlled substance.  And

3 you shall submit to the collection of a DNA sample and shall

4 comply with the standard conditions that have been adopted by

5 this Court.

6         You'll have to submit to one drug test within fifteen

7 days of the commencement of your supervised release and at

8 least, two tests thereafter as determined by the Probation

9 office.

10         Regarding the special conditions, you shall provide

11 the U.S. with a full disclosure of your financial records to

12 include yearly income tax returns upon the request of the U.S.

13 Probation office.  You shall cooperate with the Probation office

14 in the investigation of your financial dealings.  And you shall

15 provide truthful monthly statements of your income.

16         I will order you to pay a fine of $500.00.  I find

17 that you lack the ability to pay the fine within the guideline

18 range.  The Court will waive the interest requirement in this

19 case.  The fine is due immediately.  And I'd recommend that you

20 participate in the Bureau of Prisons' Financial Responsibility

21 Program and provide a minimum payment of $25.00 per quarter

22 towards the fine.

23         If the fine has not been paid before you begin your

24 supervised release of three years, you shall satisfy the amount

25 in monthly installments of not less than $50.00 to commence

115

1    thirty days after you are released from prison.

2            You shall notify the U.S. Attorney within the -- for

3    the district -- within thirty days of any change of mailing

4    address or residence change that occurs while any portions of

5    the fines remain unpaid.  I am going to direct that you pay a

6    special assessment of $500.00, which is due immediately.

7            Mr. Handy, do you understand the sentence that I've

8    just imposed?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  I know that the defense is taking the

11   position that I did not meaningfully discuss the 3553(a) factors

12   as to preserve any issues for appeal, but is the Government

13   satisfied that I have meaningfully -- meaningfully -- discussed

14   the 3553(a) factors in this case and/or if there are any

15   procedural irregularities that I'd need to address at this time?

16           MS. EVE:  No, your Honor.

17           THE COURT:  Okay.

18           So, Mr. Handy, you have fourteen days from the day

19   that I sign the judgement and commitment order in which to file

20   an appeal to the Third Circuit Court of Appeals.  If you cannot

21   afford the cost of filing such an appeal, you could ask me to

22   waive the cost of filing such an appeal.  If you cannot afford a

23   lawyer, Ms. -- Ms. Gaughan will continue to represent you free

24   of charge.  Do you understand your appellate rights?

25           THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  All right.

2          MR. GAUGHAN:  Your Honor, if --

3          THE COURT:  Is there any -- any -- anything else or any

4   requests?

5          MR. GAUGHAN:  Your Honor, I do have a request, if the

6   Court would recommend to the Bureau of Prisons, that they'd

7   designate Mr. Handy as close to Philadelphia as possible.

8          THE COURT:  Okay.

9          Does the Government oppose that request?

10          MS. EVE:  No, your Honor.

11          THE COURT:  All right.

12          I will indicate so in the judgment and commitment

13   order and so, any other requests -- any other requests?

14          MR. GAUGHAN:  Your Honor, I would also request that

15   Mr. Handy be allowed to self-surrender, once he's designated

16   through the Bureau of Prisons.

17          THE COURT:  All right.

18          What is the Government's position on -- on the

19   sentence, he's not been sentenced, what is the Government's

20   position on delaying until designation?

21          MS. EVE:  Your Honor, I'd have no objection to that.

22          THE COURT:  All right.

23          (Pause at 12:22 p.m.)

24          THE COURT:  How -- how much time are you asking,

25   Attorney Gaughan?

1          MS. EVE:  Your Honor, my understanding is it usually

2   takes between thirty and forty-five days for a designation, so I

3   would -- I would ask for the forty-five days --

4          THE COURT:  That's a long time.

5          MR. GAUGHAN:  -- and if he's designated before then, I

6   would be notified by the Marshals and I could notify the Court.

7          THE COURT:  All right.

8          Listen, I'm going to -- it's -- it's December --

9   what's today's date, December --

10         MR. GAUGHAN:  It's the 18th.

11         THE COURT:  -- 18th.

12         I'm going to give him two weeks, I'm not going to give

13  him beyond two weeks to report, I think that's -- I'll give him

14  an opportunity stay home with his family for Christmas.  Okay.

15         Anything else?

16         MR. GAUGHAN:  No, your Honor.

17         MS. EVE:  No, your Honor.

18         THE COURT:  All right, very well.

19         So, he's still required to comply with the conditions

20  of bail pending his reporting date, no later than -- why don't

21  we say, a date and time -- since that would be in the new year,

22  what do we have -- what is the first Monday of -- of January?

23         MS. EVE:  January 1st.

24         THE COURT:  January 1st, okay.

25         Why don't we make it then that Friday.

118

1          MS. EVE:  January 5th.

2          THE COURT:  January 5th, Friday, no later than noon, he

3    is to turn himself in -- in January -- Mr. Handy -- anything

4    else?

5          MR. GAUGHAN:  No, your Honor, thank you.

6          THE COURT:  All right.  Thank you very much.

7          ESR OPERATOR:  All rise.

8          (Adjourned in this matter at 12:23 p.m.)

9                        * * *

                      I N D E X

WITNESS                DIRECT    CROSS    REDIRECT    RECROSS

JOSEPH A. MILLIGAN, JR.
  By the Court          20
  By Ms. Gaughan                  23          -          -

ZIRE HANNAH
  By Ms. Eve            54
  By Ms. Gaughan                  64          -          -

GEORGE AUGE
  By Ms. Eve            71         -          -          -

                        * * *


              C E R T I F I C A T E

     I do hereby certify that the foregoing is a correct

transcript of the electronic-sound recording of the

proceedings in the above-entitled matter.


_____          Date: <u>February 19, 2018</u>
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey   08035
(856) 546-6270